JOSIAH H. GORDON, Trustee, and HENRY BROTE-
MARKLE, *vs.* WILLIAM MATTHEWS, and others,
Creditors.

*Construction of Orders of Re-sale—Trustee's Commis-
sions—Practice in the Court of Appeals—Distribu-
tion of an Insolvent's Estate.*

N applied for the benefit of the insolvent laws in May, 1859; W was
appointed trustee for the benefit of his creditors and gave bond as such.
The property of the insolvent, consisting chiefly of real estate, was sold
by the trustee under an order of the Court, in October, 1859, for $3,894,
the terms of sale being one-third cash, one-third in six and one-third in
twelve months, the credit payments to be secured by the bonds of the
purchaser, with sureties to be approved by the trustee; the insolvent
himself became the purchaser. The trustee reported that the purchaser
had complied with the terms of sale and it was finally ratified in Jan-
uary, 1860. At the instance of creditors, two audits were stated at dif-
ferent periods distributing the cash and first credit payments, including
interest upon the latter down to the time it was due, to the claims of the
creditors according to priority, paying some in full, others in part and
leaving unpaid a large number of junior claims. These audits were
finally ratified and confirmed, and most of the creditors to whom dis-
tribution was thus made brought suit on the trustee's bond for the seve-
ral sums so audited to them, and recovered judgments which were paid
by G, one of the sureties on the bond. A third audit was also stated
distributing the last credit payment, still leaving a large amount of
claims unpaid; but before this audit was ratified, the Court on petition
of G and his co-surety, stating the purchaser had only paid $710 of the
purchase money, and that W, the trustee, was insolvent, passed an
order with his consent, removing him and appointing G in his place.
G received from W $500, part of the $710, of the purchase money paid
him, and then under orders of the Court re-sold the property at the risk
of the purchaser, for $4,163 cash, a sum less by a small amount than
that ascertained by a ratified account to be due from the first purchaser
on account of his purchase. A final audit was made distributing the
funds in the hands of G; to this audit G, for himself, and as trustee for
the creditors of N, and as surety on the trustee's bond, with his co-
surety filed exceptions. HELD:

1st. That the orders directing a re-sale of the property, were not intended
to vacate and annul absolutely the sales made by the original trustee,
so as to release the purchaser from liability, they were simply orders of
re-sale at the purchaser's risk.

Gordon, Trustee, *et al.* *vs.* Matthews, *et al.*

2d. That while G was entitled to full commissions on the entire amount of the proceeds of the re-sale, he cannot be allowed commissions on the $500 received from W, the former trustee.

3d. That W, the former trustee, is not entitled to any commissions.

4th. That the claims paid by G should have been audited to him or for his use, but the omission to do so and the auditing them to the creditors instead, furnishes no ground for reversing the order ratifying the audit, it being stated therein in regard to some of the claims, that they had been paid by G, and the record disclosing that he had receipts for what he had paid for the others.

5th. That the true amount to which the creditors are justly and equitably entitled out of the proceeds of the re-sale, is the amount of the second credit instalment under the original sale, with interest thereon from the date of the first to that of the second sale; and the amount thus ascertained cannot be diminished on account of any claim or equity set up by the sureties on the trustee's bond, founded upon their having paid as such the amounts distributed by the first and second audits.

APPEAL from the Circuit Court for Allegany County.

Henry J. McNamee applied for the benefit of the Insolvent Laws of Maryland, on the 21st May, 1859, and Daniel Wineow was appointed trustee for the benefit of his creditors, and the appellants were the sureties on the bond of the trustee. Upon the application of McNamee, the Court passed an order directing the trustee to sell the property of the insolvent on the following terms: the purchase money to be paid one-third cash, one-third in six months, and one-third in twelve months, the purchaser to give security for the deferred payments. On the 10th of October, 1859, the trustee sold all the property, and the insolvent became the purchaser thereof; the purchase money amounted to the sum of $3,894. The trustee reported that the purchaser had complied with the terms of the sale, and the sale was finally ratified on the 4th of January, 1860. The auditor filed a report in the cause on the 25th of January, 1860, distributing the cash portion of the real estate, viz: the sum of $1,290 and the sum of $134.25, the one-half of the proceeds of the personal property sold, making in all the sum of $1,436.25. This audit was ratified 21st February, 1860.

Gordon, Trustee, *et al.* *vs.* Matthews, *et al.*

On the 28th May, 1860, the appellee, Matthews, a mortgage creditor, filed his petition, asking the Court to direct the auditor to state another account, distributing the sum then due for the first deferred payment, and an order was passed accordingly; and the auditor filed his second report, which was referred back to the auditor and a corrected second report filed. Objections were filed to this and the matter was referred back; and on the 27th September, 1860, the auditor filed his re-corrected second report, distributing one-half of the proceeds of the personal property and interest $130.63, and one-third of the proceeds of the real estate and interest thereon; making in all the sum of $1,479.32. This audit was ratified on the 6th of November, 1860. On the 24th December, 1860, Matthews filed another petition, praying for another audit to make distribution of the balance of the purchase money or the second deferred payment, which was then due from the purchaser. And the Court passed an order as prayed. On the 5th of January, 1861, and after the auditor had been ordered by the Court to distribute the third instalment of the purchase money, the appellants, the sureties on the bond of the trustee, filed their petition, stating that Wineow had sold the property to McNamee, who had not complied with the terms of sale, and had paid no part of the purchase money, except $710, and that he was insolvent, and praying for his removal as trustee, and the appointment of a new trustee. Upon this petition, with the consent of Wineow, the Court passed the order removing him and appointing the appellant Gordon, as trustee, in his stead. On the 21st February, 1861, Gordon, as trustee, filed a petition stating that upon examining into the trust, he found that Wineow on the 10th October, 1859, had sold all the personal property to McNamee for $268.50, and that he undertook and professed to sell certain portions of the real estate to McNamee for $3,601.50, and to Oliver Clark a lot on Polk street for $24; that Wineow had reported the sales and stated that the purchasers had complied with the terms of sale, and that the

sales had been ratified by the Court; and then charged that the attempt by Wineow to sell said real estate was void, and that no sufficient description of any part of said real estate was given by said Wineow, in his report, to identify the property intended to be sold, and that no title could pass by said sale; that none of the purchasers had complied with the terms of sale; that McNamee did not pay the cash payment, nor give his notes for the deferred payments, as required by the terms of sale; and that McNamee had only paid to Wineow, on said purchase money, $710; that Clark had not paid his purchase money, nor complied with the terms of sale; that Wineow had paid him, Gordon, on account of the purchase money received by him, the sum of $500, but had not paid the balance received by him; that each of said purchasers had been notified of the ratification of the sales, and required to pay the purchase money now due, but had refused to do so; the petition then prayed that the purchasers might be compelled to pay the purchase money, with interest thereon, and that in default, the real estate might be decreed to be sold to raise the same; and that Wineow might be decreed to deliver to Gordon all the property of said trust he had received.

On the same day the Court (WEISEL, J.,) passed an order requiring McNamee to bring into Court $3,160, with interest from 10th October, 1859, or show cause to the contrary before the 5th of March next, and Wineow to pay over to Gordon all moneys received by him as trustee, which had not already been paid, and deliver to Gordon all the securities he had received for the payment of any part of the purchase money.

After this order was passed, the auditor, on the 15th of April, 1861, filed his third report distributing the third instalment of the purchase money. Upon this audit no action of the Court was invoked by the creditors. On the 27th of October, 1862, Gordon as trustee, filed another petition stating that McNamee did not bring the money into Court, as directed by the previous order *nisi,* nor show cause why he

should not, but that McNamee, on the 28th February, 1861, after service of the former order on him, agreed with Gordon that an order should be passed for a re-sale of part of the said property, and that the object was to raise part of the purchase money from a sale of the property mentioned in said order. The petition then stated that McNamee persuaded and induced Wineow to execute a deed of conveyance to him for lots E and F, in this cause described, under the pretence that he would be able to lay them off into town lots, and make advantageous sales of the same, if he, McNamee, had the legal title; and that Wineow, under such persuasions, did execute said deed, but no part of the purchase money for said lots or of any of said property, was ever paid, except $710; that McNamee thereupon, on the 16th of July, 1860, executed a voluntary deed of part of said lots E and F to Wineow's wife, sister of McNamee, and that there was no consideration therefor; and that the same was void as against the petitioner and the creditors of McNamee; and that McNamee about the 28th December, 1860, conveyed part of said lots E and F to John B. Widener; and prayed the Court to pass a final order requiring said McNamee to pay to him, Gordon, $3,160, with interest from 10th October, 1859; also for an order setting aside the deed from Wineow to McNamee, and the deed to Widener and Eleanor Wineow, and an order to re-sell the property upon such terms as to the Court might seem just and right, and for further relief. An order *nisi* on this petition was passed as against McNamee, Mrs. Wineow and her husband, and Widener. Mrs. Wineow and McNamee showed cause against the petition.

Thereupon the Court passed a decree on the 19th November, 1862, setting aside the sale of the property theretofore sold by Daniel Wineow, as trustee of said McNamee, except so far as the property described as lots E and F was concerned, and requiring the said Gordon, as trustee, to re-sell all the property of the said McNamee, real and personal, mentioned in the report of sales made by said Wineow,

except said lots E and F, for the payment of the purchase money due by said McNamee, as stated in the petition of said Gordon, with interest as aforesaid, in the manner directed by the original order of sale, for cash, to be paid on the day of sale and that said sale be at the risk of the said McNamee, &c., and reserving all rights of the several parties so far as the property described as E and F was concerned, and authorizing the parties to take testimony before the auditor as to the questions to be decided as to said lots E and F.

After taking some testimony, the Court, on 10th Feb'y, 1863, passed a similar order setting aside and annulling the sale of the lots E and F, sold by Wineow, as trustee to McNamee, and also setting aside the deed from Wineow to McNamee, conveying said lots, except that the order was not to have any effect upon those portions of E and F conveyed to Ellen Wineow and J. B. Widener; and by the same order Gordon was directed to re-sell the same property at the risk of McNamee, for the payment of the purchase money due thereon.

On the 30th March, 1863, Gordon filed his report as trustee, showing the sale of all the real estate for the sum of $4,163 cash. Matthews and some of the other creditors filed their petition on the 1st April, 1863, objecting to the ratification of the third audit and praying that an audit might be made of the funds received by Gordon, when the sale should be ratified. On the 6th of May, 1863, the Court finally ratified and confirmed the sale made by Gordon, as trustee, except the lots E and F; the question as to the sale of said lots being reserved for the further action of the Court, and the cause was referred to the auditor.

On the 13th of May, 1863, the auditor filed his special report, made at the request of Gordon, showing the state of the account of McNamee for the purchase money due on the first sale, and making a balance due from him of $4,202.73. This account was ratified 1st June, 1863, and the Court in the order of ratification directed that McNamee should be

credited with the net proceeds of sales made by Gordon, the new trustee, after deducting all proper costs, charges, &c., in procuring said re-sale and in making the same.

On the 21st June, 1864, the Court ratified the sale by Gordon, of certain portions of lots E and F. The auditor at the instance of Gordon stated the account filed October 15th, 1864, being the fourth report making distribution of the fund arising from the re-sale, and which presents the mode of distribution deemed correct by the appellants.

On the 22d of October, 1864, Matthews and other creditors filed exceptions to this fourth report of the auditor. On the 8th of September, 1866, the Court (R. JOHNSON, Jr., Special Judge) delivered an opinion announcing the principles upon which the fund in the hands of Gordon should be distributed. In accordance with this opinion the auditor on the 23d November, 1866, filed his fifth report. To this audit, Gordon, for himself, and as trustee for the creditors of McNamee, and Brotemarkle and Gordon, as securities on the trustee's bond of Wineow, filed among others the following exceptions:

First. Because the auditor, in distributing the proceeds of the property sold by Gordon, does not treat the first, second and third reports of the auditor, filed in the cause as a full ascertainment of the amount of the proceeds of the property of McNamee, to which his creditors were entitled in this cause; and because said fifth report does not distribute the proceeds of sales by said Gordon upon that theory.

Second. Because said fifth report does not treat the proceeds of the sale made by Gordon as a re-sale, made at the risk of McNamee, for the purpose of paying the purchase money due and owing by him as a purchaser of the property sold by Daniel Wineow, the former trustee, and reported by said Wineow, but treats said proceeds as though no previous sale had been made, and as if the amount due to the several creditors of McNamee had not been settled and ascertained by the first, second and third audits filed in the cause.

16                    v. 30

Third. Because said fifth report does not allow Gordon the sums of money paid by him to the several parties entitled to payment, or the interest upon the several sums of money paid by him, as shown by the statement of the auditor filed October 19th, 1864, and to which the said Gordon is entitled as a party having paid said sums to creditors, and being now entitled by subrogation to stand in the place of said creditors, and receive the same sums to which they would have been entitled if they had not been paid by him.

Fourth. Because said fifth report distributes the sum of twenty-six dollars and ninety-one cents to Hanson Willison, which should have been distributed to Gordon.

Fifth. Because said fifth report distributes to Mary Hoye, use of Samuel M. Semmes, the sum of five hundred and nineteen dollars and eighty-four cents, when it appears from the auditor's statement of claims paid by Gordon, that he had paid to the said Semmes the sum of $440.50, and was entitled to be allowed said sum instead of Semmes.

Sixth. Because Gordon was not allowed commissions upon the sum of $500 collected by him of Daniel Wineow.

Seventh. Because the several sums stated by said audit as having been paid by Gordon, are not distributed to him or for his use.

Eighth. Because the several sums of money shown by the auditor's statement filed October 19th, 1864, to be paid by Gordon are not by said audit No. 5 distributed or allowed to said Gordon.

These exceptions were overruled by the Court and on the 27th of March, 1867, an order was passed ratifying and confirming the audit. From this order the present appeal was taken.

The cause was argued before STEWART, BRENT, GRASON, MILLER, ALVEY and ROBINSON, J.

*Josiah H. Gordon,* for the appellants.

*George A. Pearre,* for the appellees.

MILLER, J., delivered the opinion of the Court.

It appears from the record in this case, that Henry J. McNamee applied for the benefit of the insolvent laws in May, 1859; that Daniel Wineow was appointed trustee for the benefit of his creditors, and the appellants became sureties on the trustee's bond; that the property consisting chiefly of real estate, was sold by the trustee under order of the Court, in October, 1859, for $3,894.00, the terms of sale being one-third cash, one-third in six and one-third in twelve months, the credit payments to be secured by the bonds of the purchaser with sureties to be approved by the trustee, and that the insolvent himself became the purchaser. In his report the trustee stated the purchaser had complied with the terms of sale and it was finally ratified in January, 1860. At the instance of creditors two audits were stated at different periods, distributing the cash and first credit payments, including interest upon the latter down to the time it was due, to the claims of the creditors according to priority paying some in full, others in part and leaving unpaid a large number of junior claims. These audits were finally ratified in February and November, 1860, and most of the creditors to whom distribution was thus made brought suits on the trustee's bond for the several sums so audited to them, and recovered judgments which were paid by Mr. Gordon, one of the sureties. A third audit was also stated distributing the last credit payment, still leaving a large amount of claims unpaid; but before this audit was ratified the Court on petition of the appellants filed in January, 1861, stating the purchaser had paid no part of the purchase money, except $710, and that Wineow was insolvent, passed an order, with Wineow's consent, removing him and appointing Mr. Gordon, trustee, in his place. The new trustee received from Wineow $500 out of the $710, of purchase money paid him, and then under orders

of the Court re-sold the property in March, 1863, for $4,163 cash, a sum less by a small amount than that ascertained by a ratified account to be due from the first purchaser on account of his purchase. To the final audit distributing the funds in Mr. Gordon's hands, exceptions were filed by the appellants and from the order ratifying it they have appealed.

We do not agree with the Special Judge who passed the order appealed from in his interpretation of the effect of the orders of Judge WEISEL directing a re-sale. The order of February, 1861, directed all the real estate to be re-sold for the payment of the purchase money due by McNamee, and that such sale should be at his risk. That of November, 1862, directs the sale made by Wineow to be "set aside," except as to lots E and F, but also directs the trustee to re-sell for the payment of the purchase money due by McNamee and that said sale shall be at his risk. Again in the order of February, 1863, the sales of lots E and F are annulled and set aside, but the trustee is directed to re-sell them at the risk of McNamee for the payment of the purchase money due thereon by him. That it was not the intention of the Judge, who passed these orders, to absolutely vacate and annul the sales made by Wineow, so as to release the purchaser from liability, is apparent not only from his opinion of June, 1864, accompanying the order affirming the re-sale of the two lots in which he treats them simply as orders of re-sale at the purchaser's risk, but also from his order of June, 1863, ratifying the account showing the amount due by McNamee, as purchaser, in which it is said he will thereafter be allowed a credit for the net amount of the proceeds of sale made or to be made by the new trustee under the several orders of re-sale heretofore passed. Notwithstanding the inadvertent use of the terms "set aside" and "annul" in two of these orders, we are of opinion their true meaning was simply that of orders of re-sale at the purchaser's risk, and that they cannot have the effect to vacate and annul all that

had been done in the case, so as to require the second sale to be treated as a sale *de novo.* Nor is there any reason for so construing them. It might have been very important to the creditors that the purchaser should have been held to his contract, for though he was an insolvent applicant, yet he had been discharged under his application and for this subsequent contract of purchase all his future earnings and acquisitions would have been responsible.

The question then arises how are the funds in the hands of Mr. Gordon, the trustee, to be distributed ?

First. There is no doubt the clerk's costs in the case, auditor's fees, expenses of both the original and the re-sale, and commissions to the trustee, must be first paid. In this respect the final audit is correct. Full commissions were allowed Mr. Gordon on the entire amount of the proceeds of the re-sale, and the exception that he was not also allowed commissions on the $500 received from Wineow, the former trustee, was properly overruled. The Court was also clearly right in refusing to allow any commissions to Wineow. His conduct in the case was such as to debar him from compensation in any form.

Second. It is conceded the sums allowed to creditors in the two ratified audits distributing the cash and first credit payments of the first sale, must be next satisfied and such of them as were paid by Mr. Gordon audited to him. This has been done substantially in the audit under review. The objection that these sums are not distributed to him or for his use is to mere form. They are audited to the creditors but are stated to *have been paid by him,* and this statement is a full protection against any claim by the creditors therefor. The claims audited to Willison and to Hoye, use of Semmes, having been paid in whole or in part by Gordon, should have been audited to him or for his use or stated to have been paid by him. But the record shows he has in his possession the receipt of Willison in full, and of Semmes for the amount paid to him, and the mere omission under such circumstances to enter

these claims in the audit to his use, when it is plainly seen no injury will result therefrom, furnishes no ground for a reversal.

Third. As to the residue. The appellants insist that this being a re-sale to replace the purchase money due under the first sale, the creditors are entitled out of the residue only to the amount due by the first purchaser on the second credit payment of the sale to him, as ascertained in the third audit, the two first having disposed of the cash and first credit payments. We cannot assent to this position. The third audit was never ratified and the creditors, therefore, had no remedy on the bond of the first trustee for the sums so audited to them. The purchaser had given no security for the purchase money and their only recourse for payment was a re-sale of the property at his risk, and holding him responsible for any deficiency. Having been thus delayed in the receipt of their claims, the true amount to which they are justly and equitably entitled out of the proceeds of the re-sale, is the amount of the second credit instalment under the original sale, with interest thereon from the date of the first to that of the second sale. The amount thus ascertained belongs to the creditors and cannot be diminished on account of any claim or equity set up by the appellants or either of them founded upon the fact of their having paid, as sureties on the trustee's bond, the amounts distributed by the first and second audits. No doctrine of subrogation or other principle of equity will enable them to interfere with the claims of these creditors to this extent; and as it appears from the audit before us that the amount thereby distributed to creditors, exclusive of the sums distributed in the first and second audits, is less than the amount of the second credit payment with interest for the period above stated, it becomes unnecessary to consider what equities the appellants might have, if there had been a surplus over this amount. As the case stands they have certainly received no injury by the audit to which they have excepted.

These views dispose of all the exceptions affecting the interests or rights of the appellants. There may be errors, though we have not examined the case with that view, in the calculation of interest on the claims of some of the creditors or otherwise affecting their rights *inter sese*, but as none of them have complained we cannot redress their grievances or adjust their rights on this appeal. We have carefully considered the record with a view of determining whether the appellants have sustained injury and finding no error of which they can complain we must affirm the order appealed from.

*Order affirmed.*

(Decided 9th March, 1869.)