5 547
j 51 117

# Wheeling.

## WILLIAM CADY *vs.* EDMUND L. GALE.

### July Term, 1871.

1 Gale and wife in 1857, contracted to sell and convey to Cady, certain real estate in this state, the property of the wife, in consideration of the right to manufacture and vend a certain machine of which Cady was the proprietor, in 1857. All the parties then resided in Illinois. In 1861, the land was greatly enhanced in value by reason of the discovery of Oil deposits under the surface. Gale refuses to convey, and Cady brings suit. Gale answers, alleging worthlessness of patent, &c. HELD:

    I, That inasmuch as Cady had been manufacturing and vending the machines for two years before the sale of the right to Gale, in the neighborhood where the parties both resided, he could not have been unacquainted with it; and no fraud, misrepresentation or concealment being proved or shown on the part of Cady, and it also appearing that more than a year after the contract was made, Gale *reaffirmed* it by endorsing an extension of time for a compliance on his part, the contract must be regarded as a fair one, and specific performance decreed.

    II, Where the vendor has sold a larger interest in real estate than he has title to, a court of equity will compel him to convey such estate or interest as is vested in him; and this notwithstanding the purchaser has paid full consideration, and is willing to accept such title and interest as the vendor has in the premises, in full discharge of the contract, without remuneration or abatement.

    III. The contract involved no hardship at the time it was entered into; therefore a court of equity will not withhold its aid to enforce it, merely because of the great appreciation of the property sold, from causes unknown to, and unforeseen by each of the parties, at the time it was made.

    IV. Specific performance decreed, viz: Gale compelled to convey his interest, a life estate; the contract could not be enforced as against the wife, she not being liable in consequence of the coverture.

Bill filed in the circuit court of Wood County, at November rules, 1865. Decree dismissing bill, October term, 1867.

The material points arsiing in the case will be found amply stated in the opinion of the President.

*Okey Johnson and John J. Ridgway*, Jr. for the appellant.

*Okey Johnson and John J. Ridgeway*, Jr., for the appellant, submitted in substance the following:

The learned judge of the court below in his opinion says:

"The contract sought here to be enforced was made in 1859, and the consideration therein expressed is $1,500. If this consideration had been paid in money, it would seem, from aught that appears to the contrary, that it was a fair price for the land at that time or perhaps considerably greater than its then market value.   *   *   *   *   *   *   *

"It must be remembered that the complainant has fully complied with the contract on his part; that having paid the consideration agreed upon he is in no default.   *   *   *

"If to decree specific performance, (now that the property has become of such immense value,) is just cause of complaint by the defendant on the score of hardship and in equity, it seems to me there would be equal cause for complaint by the other party, if such decree be refused. This very circumstance brings the case within the principle that lies at the foundation of equitable interference, namely the want of adequate relief in the courts of law."   *   *   *   *

"It is plain that perfect justice can only be done in the premises by decreeing to the injured party the specific thing which he bought, whether its value be great or small, real or imaginary, and such is the relief proper in this case, unless there are controlling reasons against it."

The court, having thus recognized the equitable status of the plaintiff, declines to decree according to the prayer of his bill upon the following grounds:

I.—"That great injury and loss would be likely to result to third parties in this instance, if the defendant be directed to execute the contract, not specifically, for that is impossible, but even to extent of the interest that he can convey."

II.—That the contract now sought to be enforced is a totally different one from that entered into by the parties.

III.—Failure of consideration.

Let us consider these in their order:

I.—That great injury would be likely to result to third parties if the defendant be decreed to convey his life interest to plaintiff.

To sustain this position the learned judge quotes a passage to be found in Mr. Fry's book on specific performance. "A stranger would be likely to use his liberty to commit waste in a manner different from a husband and father, and more prejudicial to the rights of those in remainder."

Now however applicable this quotation might be in many cases, it can have no weight here, because whatever injury and loss might have resulted to third parties by giving the life estate to a stranger, has already been committed by the "husband and father." He has leased the land in controversy to certain parties, corporate and otherwise, giving them the privilege of opening mines and wells, erecting machinery and buildings for the purpose of obtaining coal and oil from the ground, reserving rent to himself, in money or percentage of profits, and these lessees have entered, dug and erected, as permitted by their leases, and it is admitted that these privileges are the only real value of the land. If the decree asked for by the plaintiff be made, these lessees will pay the rent or royalty to the plaintiff instead of the defendant.

What injury can result thereby to those in remainder, and what is there inequitable in such a decree?

The learned judge below says, that the plaintiff "is in no default," "that he has fully complied with the contract on his part," and it is not denied that the defendant has received the consideration for the conveyance, but refuses to convey.

The case from which Mr. Fry takes the sentence above quoted is *Thomas* vs. *Deering*, 1 Keene, 729, decided in 1837.

The learned judge in delivering the opinion of the court in that case, sustained the principle, so long and so well settled, that the purchaser is entitled to as large an estate as the vendor has, but said that there might be exceptions, that

in the case before him there had been no consideration paid, that the plaintiff demanded an abatement of the purchase money, equal in value to the estate, which the tenant for life could not transfer, and that "considering that *nothing had been done* upon the contract" he would dismiss the bill, but *without costs.*

There we have a defendant having a life interest, agreeing to convey in fee, but unable to do so without the consent of trustees. who refuse to join in the deed; no consideration received and the purchaser only willing to pay for the life interest; in other words a contract upon which nothing had been done.

Here we have the tenant for life *and* the tenant in fee, both joining in an agreement to make perfect title, consideration paid and the purchaser willing to take the life interest of the defendant alone, without any abatement or reserving any rights at law; a contract upon which everything has been done by the plaintiff that he can do.

And so doubtful were the court in the case cited, that they granted an *ex parte* injunction to prevent defendant from cutting timber during the suit and refsued to dissolve upon motion made, and finally dismissed the bill as is seen "without costs."

Certainly that case exhibits nothing against the granting of the prayer of the bill in these proceedings.

Can it be argued that the defendant and his wife intended to deny their contract when they signed, sealed, delivered, and received the consideration for it, or that they so intended more than a year afterwards when they reaffirmed it, or that, if the attorney, at whose office the same was drawn, had written the customary separate examination of the wife she would not have signed it? Is it not too plain for discussion that it has been the increased value of the land that has led them to seek refuge in the technicalies of the law? Is such a defendant worthy of great tenderness at the hands of a court of equity, and will a Chancellor stretch his powers of discretion to protect him in taking advantage of his and his wife's own wrong? Will he presume, especially where the evidence shows it to be practically impossible, that "great loss and injury would be *likely* to result to such third parties,"

and that therefore the defendant may enjoy the rents, issues and profits of the very land which he has sold and received the consideration for.

Upon what principle of law or ethics is this plaintiff to be turned out of court upon such delicate solicitude for those in remainder?

The application of this doctrine would prevent any life estate from being conveyed, and the books are full of such instances. Besides, the court can protect any such attempted injury by injunction, and the husbana and wife would have an action for damages.

II. That the contract now sought to be enforced is a totally different one from that entered into by the parties.

The language of the agreement is "that the said parties of the first part (Mary Gale and Edward L. Gale,) shall and will execute, acknowledge, and deliver to the said party of the second part, (Wm. Cady,) a good and sufficient warranty deed of conveyance, conveying good title, free of all incumbrances and rights of dower, to 250 acres of land in the county of Ritchie and State of Virginia, in the northwest corner of a certain tract of land."

How can it be said that the decree for the conveyance of the life estate of Edward L. Gale would be executing a totally different contract from the one entered into by the parties aforesaid? Did not the defendant agree to convey all *his* right, title and interest in the said 250 acres? How else could "a good and sufficient warranty deed of conveyance, conveying good title, free of all incumbrances" have been made, and why did he sign and seal the contract at all, if not for this very reason? The agreement recites that the land was in the name of his wife, and it must have been to preclude any claim by him that he was made a party to it.

The plaintiff only asks of the defendant the conveyance of so much of the interest in the land as he has therein, and this without any abatement for the defective title. Lord Elden, in 1804, in *Mortlock* vs. *Buller*, 10 Vesey 292, 316, says: "If a man having partial interests in an estate, chooses to enter into a contract respecting it and agreeing to sell it as his own, it is not competent for him to say afterwards, though he has

valuable interests, he has not the entirety, and therefore the purchaser shall not have the benefit of his contract. For the purpose of this jurisdiction the person contracting under these circumstances is bound by the assertion in his contract ; *and if the vendee chooses to take as much as he can have, he has a right to that and to an abatement.*"

And again in 1818 the same learned jurist repeated the principle in *Wood* vs. *Griffith*, 1 Swanston's R. 55, " If a person possessed of a term of one hundred years contracts to sell the fee, he cannot compel the purchaser to take, but the purchaser can compel him to convey the term, and this court will arrange the equities between the parties."

In 1854 in *Man* vs. *Tinker & Topham*, 19 Beavan, 576, Sir John Romilly, Master of the Rolls, also added the weight of his authority : in that case the defendant could only make a title to three-fourths of the estate he had agreed to convey, he had no interest in the other fourth, the plaintiff asked for a decree for specific performance, with an abatement of one-fourth of the purchase money. " I am of opinion," says Sir John, " that he is not entitled to any abatement, but that if he is willing to take what Mrs. Topham and Mr. Tinker can convey, he is entitled to have the agreement so far specifically performed."

Mr. Fry, before alluded to, in his book, published in 1858, in the chapter upon the incapacity of the court, in certain cases, to compel specific performance, particularly excepts the case of a defendant possessing only a part of the interest in an estate, the whole of which he has stipulated to convey, saying " the defect as to the other part, as we have seen, (*ante* § 299) is no bar to specific performance at the suit of the purchaser." (Vide cases there cited.)

The only doubts which have been thrown upon the subject have been by Lord Reddesdale in two Irish cases, (1 Sch. & Lef. 13 and 2 id. 549) who considered that the principle only applies where on the faith of an agreement, one party has put himself in a situation from which he cannot extricate himself, and is therefore willing to forego part of his agreement, or where an injury would be sustained by the plaintiff unless he were to get such an execution of the contract as the defendant could give.

Lord Langdale in *Thomas* vs. *Dering*, (*supra*) remarks that this view of the jurisdiction is certainly narrower than that entertained by previous judges, and Lord St. Leonards in 2 Jon. & Lat. 460, 487. said: "I doubt whether that (Lord Reddesdale's opinion) can be maintained as the law of the court where there is no fraud in the transaction. If there be a *bona fide* intention to execute the power and the contract cannot be carried into effect I do not see why the interest of the tenant for life should not be bound to the extent he is able to bind it, unless there be some inconvenience."

It is submitted however, that admitting Lord Reddesdale to be correct, the present case falls within the principles laid down by him in both the cases aforesaid. The plaintiff assigned as consideration for the agreement a very valuable patent, and for twelve years was deprived of the profit, which he might have derived from it, and which patent having expired is now worthless, undoubtedly he is in a "situation from which he cannot extricate himself, and is therefore willing to forego part of his agreement," and a great injury would be sustained by him unless he gets such an execution of the contract as the defendant can give.

In every case in which there have been any doubts expressed, and these are very few, it has been upon an executory contract, unperformed in any way by either party.

It is respectfully submitted that no case can be found where the consideration has been paid, where no abatement is demanded and the remedy at law surrendered, in which, specific performance of the contract for so much of the interest of the vendor as is in his possession has been refused.

The general rule is that the purchaser, if he chooses, is entitled to have the contract specifically performed as far as the vender can perform it, and to have an abatement out of the purchase money or compensation for any deficiency in the title, quantity, quality, description, or the matters touching the estate.

2 Story's Eq. jur., § 779; 9 Johns, 465; 3 Bevan, 124.

In the State of Virginia the same doctrine has been settled in 2 Randolph, 120; *Evans* vs. *Kingsberry*, where the court said:

"When a purchaser cannot get a title to all he contracted
70

for, if he can get the substantial inducement to the contract, he may insist upon taking, or he may be bound to accept the title for so much as the other party can give a good title for, with a reasonable compensation for so much as the party cannot make a title to, or in case the title is defective in a small matter, perhaps a purchaser might be compelled to accept the title with an indemnity against the defect of title. * * *

In 1855, *Clarke et al.* vs. *Reins*, was decided by the Supreme Court of Virginia, 12 Grattan, and is so similar, and the opinion of the Court, all the judges sitting, so covers the whole ground of this case that it settles the law completely in favor of the decree prayed for by this plaintiff.

Reins was in possession of certain lots of ground, and an action of ejectment was commenced therefor by Clarke *et al*; all parties signed an agreement by which the value of the lots was to be fixed by arbitrators named and upon their report being filed, the amount found by them was to be paid to Clarke, *et al*, by Reins, and they were thereupon to convey to him a good title to the said lots.  The arbitrators reported settling the amount, which sum Reins tendered and requested a conveyance, upon this being refused he filed his bill. It appeared in evidence that one of the parties was a married woman, (Mrs. Branch,) and therefore not bound by the agreement.  The circuit court decreed a conveyance.

Upon the appeal by Clarke, *et al*, the opinion is delivered by Judge Daniel, who reviews the authorities and elaborately discusses the whole question.  "Nothing," says the learned judge, "stands in the way of affirming, in everything, the decree for a specific execution, except the want of power in the court to coerce a conveyance of the estate of a married female appellant; a difficulty suggested here for the first time. In this state of things *what show of equity have the appellants for insisting that because they cannot comply with their whole undertaking, they shall also be excused from performing such portion of it as is clearly within their power.* * * * * * It is familiar practice to make decrees for the partial performance of contracts, with compensation to the injured party, in cases where the measure of compensation is certain or easy of ascertainment."

* * * "I do not think, however, that he (Reins) ought

to have a conveyance of the life interest of the appellant, Branch, *unless* he is willing to take that, together with a conveyance of the undivided interest of Clarke and Harris *in full* of his demand."

The decree entered was, that the appellee be allowed the option of having a decree for a conveyance of the undivided interest of Harris and Clarke, and of the *interest of the appellant David W. Branch,* in the land, on first paying, &c., or a decree for the undivided shares of Harris and Clarke only, upon first paying, &c., so much of said sum as shall remain after deducting the value of the undivided share of Mrs. Branch therein.

At the time of the contract between plaintiff and defendant in this case, to wit, in 1859, the above was the law of the State in which the land, agreed to be conveyed, lay. The reports of the State of West Virginia show no cases upon the subject.

III.—Failure of consideration.

In 1854 Walter Keeler conveyed to defendant's wife 2,000 acres of land, at $3.00 per acre, and in 1859 the defendant and his wife received from the plaintiff a patent right, estimated at $1,500, in the agreement aforesaid, being at the rate 'of $6.00 per acre for 250 acres of the said land. It will thus be seen that the plaintiff, assuming the patent right to be worth only $1,500, paid the defendant double what he, the defendant, gave for the land.

The defendant's witnesses, Cork and Simpson, called and examined by his counsel, testify, however, that at that time and as late as 1862, the said land was not worth more than one or two dollars per acre. The former also adds that in the same year the contract was made, (1859,) an oil well had been bored upon defendant's land, which must therefore have been in operation or at least opened for a year or more before the re-affirmation of the contract by the parties in December, 1860.

The consideration for the agreement to convey was the assignment of a certain patent right to a wood sawing machine for the then State of Virginia, which assignment was made by the plaintiff and delivered to the defendant upon the same day the agreement was signed.

It is not pretended that these letters patent were not legally what they purported to be, or that the plaintiff was not lawfully possessed thereof.

In what then is there failure of consideration? Unless there can be something urged against the patent right *per se*, the defendant got all that was agreed upon. The plaintiff did not contract to make and sell the machines manufactured under the patent by defendant. If the defendant did not have the funds or did not choose to take advantage of the privileges granted him, surely the plaintiff is not liable, he parted with these privileges which were worth very considerable to him. The patent was in its infancy, only two years old, and had until 1871 to run, who could tell how valuable it might be as its merits became known? That it was extremely valuable the evidence is overwhelmingly convincing, but whether it was or not is entirely immaterial, and to place the matter beyond a possible doubt, the defendant and his wife after fourteen months experience of the said letters patent, expressed their satisfaction under their hands and seals by the endorsement upon the agreement.

Is not this defence of failure of consideration the very baldest that was ever set up in any court of law or equity?

Not the slightest scintilla of fraud proven or a single misrepresentation made. The consideration received and more than a year afterwards entire satisfaction and acquiesence expressed.

But, for the sake of argument, admit that the question of the valuableness of the machine, patented by the said letters, be a question for consideration, does the defendant stand in any better position? Upon an examination of the testimony taken in this cause, the court will find a unanimity of sentiment on the subject that places the matter absolutely beyond doubt.

Mr. Wayne, a manufacturer of machines in the city of Detroit, for seventeen years, and who had been making this particular machine of plaintiff's for some six years previous to his examination says: that the letters patent assigned to the defendant, were worth, for the then State of Virginia, selling out the State entire, the sum of *ten thousand dollars*, and selling out the said State in counties, *double* that amount.

This evidence stands entirely uncontradicted. In addition to this, there is the testimony of some nineteen or twenty manufacturers, machinists and farmers, from all parts of the United States, which speak in the very highest terms of the said patent.

Surely it will be said, the defendant has some witnesses whose knowledge of machinery and acquaintance with manufactures or mechanical principles will controvert or weaken this array of evidence.

There is not one. The defendant, rich with the money derived from the land which ought in all honor to belong to the plaintiff, in all the breadth of the Union can find but one witness to say aught against the worth of the valuable machine, and he is a wholesale *grocery clerk* of Toledo Ohio, who was an employee of the defendant at the time of the making of the agreement, and has seen one and only one of these said machines, which one was built by the defendant with his own hands; although Mr. Eberly says, plaintiff saw it afterwards and said it was all right, yet Mr. Breckinridge, examined for the defendant, says that the said machine was not like the one he saw of plaintiff's patent. It will be noticed that Eberly, notwithstanding his being called as an expert, testifies that he cannot explain any reason why the machine he speaks of, did not answer. "He (the defendant) told me it was a *very good machine*, and I could cut with it about twenty-five cords of wood a day; I don't recollect the amount." Worthless as the witness asserts this machine to have been, he used it for some two months, taking it from Joliet, Illinois, to Caseyville, Kentucky.

The defendant called but four witnesses, with regard to the value of the machines, all of whom were residents of Homer, County of Will, Illinois, at the time of the agreement, Messrs. Brooks, Breckenridge, Hartwell and Eberly. The first, a farmer, said that he only knew of two of these Cady machines, he bought one of the plaintiff, and a Mr. Francis bought the other, the machine he bought had too soft a cross head, and it would heat right up and cut, and in answer to defendant's counsel, "As the machine was, it was worth, if I had known it at the time, all that I gave for it, less the expense of a chill cast head and ways, the head and ways were not chilled and

wore out." * * "I have heard it said that Mr. Francis' machine worked well, that being the case I don't know why the machine should not be saleable in the county of Will." Mr. Breckenridge, a joiner and general mechanic, was next examined but his testimony cannot be very valuable as he says, "I know nothing about the performance of the machine, and never saw it operate as patented by Mr. Cady." "Gale had a couple of machines, a single one, and a double one, and turned one of them over to me, the single one, and told me to do what I could with it; if I could make anything out of it to do it; these were machines manufactured by Gale, and were *not exactly like* the first one I saw of Mr. Cady's patent."

Upon cross-examination he said, that he altered this single machine and traded it off to Levi Hartwell for a colt and five dollars, and that Gale told him he took the double machine to Cincinnati, and it rotted there.

Then comes Mr. Hartwell who bought the single machine from the last witness for a colt, which he says he valued at sixty dollars and five dollars cash. Mr. Brooks has stated that he only paid Mr. Cady thirty dollars for the one he bought, so the machines, admitting this one to have been properly made, appear to have increased in value. The witness states that the machine still works well, although he must have had it some seven years, and winds up his testimony in a most unpleasant way for the defendant who called him, as follows: "Mr. Gale said he had considerable land in Virginia; he was to let Mr. Cady have a certain piece for the right of these machines, but since it became pretty valuable he wanted to *prove the right had been no benefit to him;* he said he had been to see Mr. Breckenridge and offered him three dollars a day to go to Virginia for evidence in this suit, and to bear his expenses; he also stated he had three oil wells operating on this land; I think he said one of them turned out three hundred barrels per day, and he said it was valued at one hundred thousand dollars, meaning all the land he owned; that was pretty much the substance of what he said; he said it was supposed to be worth but little when he let Mr. Cady have it." The last witness, Mr. Eberly, we have already noticed. The other three witnesses called by the defendant only testified with

regard to the value of the land in 1859, fixing it at from one to two dollars.

We have then, as has been said, only one witness' opinion, and he in no way connected with machinery or machines, to outweigh the load of testimony in favor of the patent, produced by plaintiff.

Throwing out then Bucher, Massey and Thomas, the plaintiff's witnesses are:

Wayne, manufacturer of machines for seventeen years in Detroit, Michigan, and for six years making plaintiff's machines, and still manufacturing them.

Meimath Rumely, Mienrad Rumely, manufacturers of machines in Laporte, Indiana, and also makers of plaintiff's machines.

Jones, blacksmith and machinist in Will county, Illinois.

Field, Francis, D'Arcy, Cady, Peter Ternas, Antoine Ternas, Striker, Wall, Huckins, Closser, Wells, all farmers from Illinois, Indiana and Michigan, still using machines of the Cady patent, and liking them very much; and Bowen who drew up the agreement.

The defendant, driven by the exigencies of his case to the last corner, is forced to unmask his real and only reason for non-performance of his agreement, which is, "that at the time of the said contract, neither respondent or his wife had the slightest idea or suspicion of the presence of the valuable mineral deposits since found upon the land," and that, therefore, it would be a great hardship to compel specific performance thereof.

Mr. Fry, (p. 116,) and other writers on the subject say: "The question of the hardship of a contract is generally to be judged of at the time it is entered into; if it then be fair and just it will be *immaterial* that it may, by the force of subsequent circumstances or change of events, have become less beneficial. *Lowdor* vs. *Blackford*, Beat 522; *Webb* vs. *R. R. Co.*, 9 Ha. 129.

So at law the reasonableness of a contract is to be judged of at the time it is entered into and not by the light of subsequent events. *Jones* vs. *Lees*, 26 L. J. Ex. 9.

Page 107, he says: "The fairness of a contract, like all its other qualities, must be judged of at the time it is entered

into, and not by *subsequent* events; for the fact that events uncertain at the time of the contract may afterwards happen in a manner contrary to the expectation of one or both of the parties, is no reason for holding the contract to have been unfair.

It is a well known maxim that equity looks upon things agreed to be done as actually performed.

A vendee being thus immediately seized must bear any loss which may happen to the estate between the agreement and conveyance, and will be entitled to any benefit which may accrue to it in the interim.

Sugden on Vendors, p. 173, and cases cited.

It seems that a court of equity cannot refuse to assist a vendor, merely on account of the price being unreasonable, and a specific performance will certainly be enforced if the price was reasonable at the time the contract was made, how *disproportionable* soever it may afterwards become.

Idem, p. 257; 2 John's. Ch. R., 1, 23; 14 Johns. Ch. R. 527; 11 Johns. Rep. 555; 2 Des. 636.

The answer further sets up as a defense that *neither* party knew the value of the property at the time of the contract (p. 17,) and the learned judge adopts the same view in his opinion, (p. 32,) as a reason for refusing the decree.

Sugden writes, p. 261, where neither party knows the value of the estate at the time the contract is entered into, no inadequacy of consideration will operate as a bar to the aid of equity in favor of the purchaser.

If it were otherwise, what contract would be safe, and if the supreme court adopt it, there is nothing to prevent Mr. Keeler, the grantor, to Mrs. Gale of this land, from filing a bill, alleging that neither he or she had any idea of the value of the property at the date of their conveyance, and demanding the estate back again and so on *ad infinitum.*

The demand of the plaintiff in this case so appeals to the principles of law and equity, and the honorable instincts of fair dealing, that it seems impossible for a court to refuse the relief prayed for.

To recapitulate: The contract was entered into by all parties without any fraud or misrepresentation; the consideration was received by the defendant; fourteen months after he

endorses upon the said contract his continued satisfaction; he received, if the patent assigned be valued at $1,500, the sum of six dollars an acre for land which his own witnesses testify was worth at that time but one or two dollars, and which patent, if we are governed by the testimony, was really worth, at least $10,000, and if properly managed double that amount ; there has been no laches on the part of the plaintiff, who has been prevented from receiving the title covenanted to be conveyed to him by a subterfuge of the defendant, which however legal it may be is none the less dishonorable, and now demands whatever title there be in the defendant, waiving any abatement or rights he may have at law, in consideration of the decree prayed for in his bill.

*Geo. H. Lee* for the appellee.

BERKSHIRE P. The appellant, William Cady, filed a bill in equity in the circuit court of Wood county against the appellee, Edmund L. Gale, and his wife Mary Gale, to enforce the specific performance of a contract in writing between them for the sale of a certain tract of land in Ritchie county. The contract is dated the 3d of October, 1859, signed and sealed by the parties: whereby the said Gale and wife, in consideration of fifteen hundred dollars, the receipt of which is acknowledged, bind themselves to execute and deliver to the said Cady, within six months from the date thereof, a good and sufficient warranty deed for two hundred and fifty acres of land in Ritchie county, Virginia, off of the northwest corner of a certain tract of two thousand acres, which had been conveyed to the said Mary Gale by Walter Keeler and wife in 1854. There is also a memorandum in writing dated 19th of December, 1860, endorsed on the contract signed by all the parties to it, whereby it is stipulated between them, that the provisions of the contract should be extended to the first of June following. The bill alleges that the contract was executed in the town of Joliet, in the State of Illinois, where all the parties to it then resided, and that the complainant, at the time, was advised and believed he could, under the laws of Virginia, enforce the contract and compel a conveyance for the land from Mary Gale as well as her husband. But being surprised to learn afterwards that the contract could not be

enforced as to her, and knowing that the said Edmund L. Gale had children by the said Mary, born alive, during their coverture, and therefore a life estate in the land in controversy, complainant frequently demanded of said Gale a conveyance of the same in fee simple, or if that could not be obtained, a deed for his life interest, (which he was willing to take in full discharge of said contract,) and that he utterly refused to make complainant a deed for any interest whatever. And the prayer is that the defendants be compelled to convey the land in fee simple, or if not entitled to such a conveyance that Edmund L. Gale be made to convey his life interest; and also for general relief.

At a subsequent term of the court, the bill was dismissed as to Mary Gale, at the instance of the complainant, and at his costs. Subsequently an amended bill was filed with the same allegations contained in the original bill, and alleging further that while the complainant had fully complied with the contract on his part the defendants, Edmund L. Gale and Mary Gale and each had wholly failed and refused to comply with or execute the contract, in whole or in part; that complainant paid the full value of the premises in dispute, and that since the time fixed for the execution of the deed for the land, valuable discoveries of oil, &c., had been made under the surface of the premises, and that the defendant, Edmund L. Gale, had made numerous and profitable leases of parts of such premises, and received large sums of money by way of *bonus* for the same, and also received as royalty or rent a certain portion of the oil that might be obtained under them. Said Gale is made a party defendant and required to answer and make a full and particular discovery as to the number of leases, the amount received by him as a bonus thereon, or for royalty, the amount of the latter reserved on such leases, and that he be decreed to pay and account to complainant for all sums of money and oil received on account of said leases; to assign and deliver the same to complainant and also execute and deliver a deed for the land in controversy, and for general relief. The answers of Edmund L. Gale to the original and amended bill admit the execution of the contract at the time alleged. Also the birth of children as alleged, and that no deed had been executed for the land in dispute, but denies that the complainant paid a consideration of $1,500, and avers

that he only assigned or conveyed to his wife, Mary Gale, a certain patent right for a "certain improvement on a wood sawing machine," patented to the complainant the 6th of January, 1857, which right was *estimated* by them at $1,500; and the assignment or conveyance of the same is filed as an exhibit of the answer and bears even date with the contract. It is also averred that although represented by complainant to be of great value, the said patent right so assigned was in fact wholly worthless, and that the complainant really paid no consideration for the land, but cheated and defrauded the wife of respondent; that respondent, after the contract and assignment were made, heard nothing more of the matter until shortly before the institution of this suit; that in the meantime the premises now in dispute very greatly appreciated in value an account of the discovery of the oil, &c., throughout the same, though before such discovery the land (being rough and hilly) was of very little value; that neither he or his wife had the slightest knowledge or suspicion, when the contract was entered into and assignment made, of the presence (under the surface) of the oil, &c., and which contract, it was submitted, was therefore made in such utter ignorance of the subject they were disposing of and misconception of its real value that no court of equity ought to enforce the contract. And it is also admitted that the defendant had made sundry leases on the land and received as bonus sundry sums of money and reserved in the leases as royalty certain portions of the oil, &c. A large amount of testimony is found in the record, principally in reference to the question of the value of machines manufactured, and also sold under said patent, by Gale and others; and a portion of it refers to the question of the relative value of the patent right so assigned to Mrs. Gale, and the land in controversy at the time of the contract. Upon the final hearing the bill was dismissed with costs, and the question now is whether this decree is erroneous.

After an attentive examination of the cases, as well of the authorities as of the facts appearing in the record, I am unable to concur in the conclusions arrived at by the learned judge of the circuit court. But, with all respect, it seems to me the reasons assigned in support of his conclusions are in-

adequate and fail to show anything that ought to preclude the appellant from relief in a court of equity.   In the opinion of the learned judge, which is made a part of the record, it is conceded that the *contract* was fair and untainted with fraud, and that the appellant had fully complied with it on his part, aad was in no default while the appellee had wholly failed to do so on his part, and was therefore in default. And of this there can be no shade of doubt.

It appears that the patent, (the right for which for the State of West Virginia was assigned to Mrs. Gale as the consideration for the land now in controversy,) issued to the appellant more than two years before the contract was entered into; and that in the meantime the appellant and others had been engaged in manufacturing and vending machines made under this patent, in the neighborhood of Joliet, where the parties to the contract then resided.   It is but reasonable to assume, therefore, that the appellee was acquaiuted with the right which was so purchased, while no misrepresentation, concealment or fraud on the part of the appellant, is shown.   And it moreover appears, that fourteen months after the date of the contract, and after the appellee had been engaged in the sale of machines manufactured under said patent—which machines, it appears, he recommended to be good, he *reaffirmed* the contract, by entering into the written memorandum endorsed on it, stipulating for further time for a compliance with it on his part   Therefore the thing sold by the appellant and purchased by the appellee and wife, being the right to sell such patent right, and to make and sell machines under it, within the State of Virginia, it is wholly unnecessary to go into the question, so much discussed, of the value of the machines that may have been manufactured and sold under the patent referred to in the testimony in the cause, nor is it material to inquire into the question of the adequacy of consideration; but I will add that if such an inquiry was necessary, it is clear *from the proofs*, that the right so assigned was, in fact, worth much more than the land, at the date of the contract.

Regarding, then, the contract as a fair one and founded on adequate consideration, nothing is seen in the peculiar circumstances now surrounding the case, that should prevent a

court of equity from extending to the appellant relief in the premises to the extent of the appellees interest therein. The doctrine has been long and firmly settled by the authorities in England, that where a vendor contracts to sell a larger interest in the real estate than he has title to, a court of equity will compel him, at the suit of his vendee, to convey to the latter, such an estate or interest as the former may have in the premises contracted to be sold. And there seems to be *no* exception to the rule where, as in this case, the purchaser has paid the full consideration, and is willing to accept such title and interest, as the vendor hath in the premises purchased, in full discharge of the contract, *without* remuneration or abatement. *Martlock* vs. *Butler* 10 Vesey, Jr. 292. *Wood* vs. *Griffith* 1 Swanst. R. 55. *Mare* vs. *Tinker and Topham* 19 Beavan 576 ———. Fry on Specific Performance —— §299 and authorities cited. And this doctrine has been fully recognized in this country, and especially by the Court of Appeals of Virginia. 2 Story Eq. Jur. §779, 9 Johns 456. *Evans & Co.* vs. *Kingsberry* 2 Ran, 120. *Clark, et al,* vs. *Reins* 12 Gratt. 98. The latter case *in principle*, it is conceived, is like the present, and fully sustains the claim of the appellant for relief in the premises. It was strongly urged upon the argument here, that on account of the extraordinary and enormous advance in the land in controversy, by the discovery of the Oil, &c., since the contract, it would be unjust and oppressive on the appellee and his wife, to enforce the contract now.

It is very evident from the testimony, that this great appreciation of the premises, since the contract, is the real *key* to the defence now being made, for one of the appellee's own witnesses, states that he was informed by the former, that he had traded some Virginia lands for the patent right, but as the land had *since increased so in value*, he wanted to *prove that the machines were of no benefit to him.*

The question of the *hardship* of a contract is to be referred to the time of *making it*. Fry on S. Perform. and authorities referred to. The contract in this instance, involved no hardship whatever when it was entered into, and it is well settled that courts of equity will not withhold their aid to enforce such contract, merely because of the great *appreciation* or *depreciation* of the property sold, from causes which were un-

known to, and unforeseen by each of the parties to the contract at the time it was made. 1 Sugden on Vendors 338. Fry on S. P. Star-page 116. 2d Story Eq. Jur. §789–790.

It is also assigned as a reason against the performance of the contract in this case, that it would necessarily result in great injury to third parties now interested in the premises in controversy. But it is not perceived, how such consequences would follow. The appellant will take *no more interest* than the appellee had in the premises, and will stand in his shoes, with reference both to the lessees, whose leases now cover the entire premises, and the remainderman, Mrs. Gale, and can have no *greater* rights and privileges, as against the latter, than the appellee himself could exercise. My conclusion therefore is that the decree should be reversed with costs; the appellee decreed to convey his interest in the land in controversy, to the appellant, the cause remanded to the circuit court for further proceedings, and that an account of the rents and profits be there taken in accordance with the prayer of the bill.

The other judges concurred.

DECREE REVERSED.