[No. 20918. Department Two. April 11, 1928.]

## W. H. CAMERON et al., Appellants, v. ROY L. HURN et al., Respondents.[1]

[1] VENDOR AND PURCHASER (59)—RESCISSION BY PURCHASER—DE-
FENSES. The vendee in an executory contract of sale is entitled
to rescind the contract, upon the vendor's refusal to restore
buildings destroyed by fire, only where the property destroyed
was of the material substance of the contract; and espe-
cially where the contract provided that the vendee should stand
all such losses.

[2] ATTORNEY AND CLIENT (30)—DUTIES—NEGLIGENCE—ADVICE AS TO
REMEDIES. An attorney is not liable to his client for loss
through failure to advise him of a remedy which was of doubt-
ful application and extremely hazardous.

[3] SAME (33)—DEALINGS WITH CLIENT—SETTLEMENT—RETAINING
MONEY. A settlement between an attorney and client whereby
the attorney retained money which he concedes was not ac-
counted for will be set aside as to the sum so retained.

Appeal from a judgment of the superior court for
Lewis county, Kirby, J., entered June 11, 1927, upon
findings in favor of the defendants, in an action for
rescission, tried to the court. Reversed.

*Rice & Stinson* and *W. H. Cameron*, for appellants.

*C. D. Cunningham* and *C. A. Studebaker*, for re-
spondents.

FULLERTON, J.—On May 6, 1924, one Gus Salzer
was the owner of a tract of land situated in Lewis
county, operated principally as a dairy farm. The
farm was equipped with the usual farming and dairy
implements and utensils, and had thereon in livestock,
in addition to a team of horses, some twenty-five head
of dairy cattle. The real property was mortgaged to
the Federal loan bank in the sum of $4,500. On the

[1] Reported in 266 Pac. 179.

date above named, Salzer contracted to sell the entire property to the respondent, Roy Hurn, for a consideration of $13,267.20. The contract recited that of the contract price $11,000 was to be paid for the real property and $2,267.20 for the personal property. The purchaser made no down payment on the property, but agreed to pay at the rate of $150 per month for a period of fifteen months until the sum at which the personal property was valued was paid, and $300 per year thereafter until the sum at which the real property was valued was paid. The contract also called for the payment of interest on the deferred payments at the rate of six per cent per annum, and required the purchaser to pay all taxes and assessments that might be levied upon the property.

The contract contained conditions giving the seller the right of forfeiture on the failure of the purchaser to live up to the terms of the contract. Finally, it was provided that, if the purchaser made the payments as they matured and lived up to the other conditions of the agreement, the seller would convey to him the personal property and the land free and clear of all incumbrances, save such as might exist thereon for taxes and other forms of municipal or state assessments.

Hurn entered into the possession of the property and began the operation of a dairy. He delivered the milk produced to a local concern which paid for it at monthly intervals. He was then indebted on a number of small bills aggregating several hundred dollars, and one of his creditors began an action against him to recover on his account, and at the same time sued out a writ of garnishment and caused it to be served upon the concern to which Hurn was delivering the milk. The matter was of some importance to Hurn, as he was depending upon the funds from the sales

of milk to meet the current payments as they became due on his contract of purchase, and if he was compelled to meet at once his outstanding obligations, he must, of necessity, default in such payments.

Confronted with these conditions, he consulted with the appellant, Cameron, who was an attorney at law in the active practice of his profession, as to the best method of meeting the situation. The parties thereupon entered into some form of agreement which the record does not make very clear. But the result was that Cameron took an immediate assignment of the products of the farm, and, later on, an assignment of the contract between Salzer and Hurn and a bill of sale of certain personal property belonging to Hurn, and not included in the contract with Salzer. Thereafter he satisfied the obligations of Hurn, and made the contract payments as they became due to Salzer. It was evidently thought, at the time the arrangement was entered into, that it would be but temporary, but it continued until all of the large payments coming due to Salzer had been met; that is to say, until the time when the balance of the purchase price of the property purchased could be met by yearly payments of $300, plus the interest on the deferred payments and the taxes and assessments. The produce from the farm, however, did not meet the obligations that Cameron was obligated to pay. His receipts during the time had been much less than he had actually expended.

At this time, the principal buildings upon the farm were destroyed by fire, together with practically all of the farm equipment. Hurn had accumulated a large quantity of feed for the dairy stock, and this was also destroyed. The principal buildings were insured in favor of the Federal loan bank, and Hurn had insurance in his own favor on the personal property and feed.

The insurance money was collected by Cameron, and was in part credited to Hurn's account.

Following the fire, Cameron purchased from Salzer, Salzer's interest in the contract, taking from him a deed to the land and a bill of sale of the personal property. In the course of the deal, the mortgage to the Federal land bank was paid and satisfied. Cameron then made a new contract with Hurn for the sale of the property to him. The sale price expressed in the contract was $16,716.45. This sum was made up from the account Cameron had kept of the transactions. He charged Hurn with the advancements made to his use, with the sums paid Salzer in the purchase of the contract, and an amount ($500) for the services he had performed for Hurn, and deducted therefrom the sums received from the products of the farm and the sums he received from the insurance companies. This left a balance in favor of Hurn in the sum of $1,208.41, which was sought to be accounted for in the contract of sale. It was provided that this sum "is to be used in the payment of a new dwelling house or other building" to be erected on the premises when "the consideration on said contract . . . has been paid to the sum of $8,000." The terms of the sale were embodied in two separate instruments, dated, respectively, February 1, 1926, and April 21, 1926.

The action before us was brought by Cameron on May 6, 1926, to forfeit the contract between them. The action was based on a breach of its conditions by Hurn. For answer, Hurn denied the alleged breaches of the contract charged against him, but did not seek to have the contract enforced. He alleged fraud upon the part of Cameron, whereby he had been deprived of the benefits of the contract he had with Salzer, and claimed damages in the sum of $4,000.

The trial judge made no formal findings of fact, but did file a written opinion in which the facts were considered with some minuteness. He refused to accept the contention of Hurn that it was the purpose of Cameron to cheat and defraud him out of the property, but did find that the contract subsequently entered into between them was one which Cameron knew that Hurn would be unable to perform. He concluded that Cameron was acting as the attorney of Hurn, and that it was his duty as such attorney to advise him what his rights were when the fire occurred; further concluding that:

"Hurn had the right at this time to require Salzer to replace these buildings or return the money which had been paid on the Salzer contract up to that date, which, as I figure it up, was $3,034.18. This, together with the insurance to which he was entitled amounted to some $4,429.71. Since Hurn was indebted to Cameron in the sum of $2,296.04 he could, if he had got this insurance and the money back from Salzer, have paid Cameron back and had $2,133.67 left over."

The judge further said:

"The extent of the damage is rather difficult to determine, but based upon what the status of the parties would have been had the legal advice been given, less a fair compensation for services rendered by Mr. Cameron, I feel that $1,750 is as near as the court can get at the amount."

Judgment was entered for this sum, and Cameron appeals therefrom.

[1] The trial court seems to have based its conclusion, that there could be a recovery for the cause it assigned, on the case of *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29. In that case, it was held that a purchaser of real property under an executory contract of sale calling for instalment payments could recover from his vendor the instalments paid, if the buildings

thereon were destroyed by fire while the contract was in force and the vendor refused to rebuild on his demand. In that instance, the buildings destroyed constituted the principal value of the property, and recovery was allowed because of a failure of consideration. But there are conditions here presented which render the rule of that case of doubtful application. In the first place, the rule is not of universal applicability. It was not meant by the decision that a purchaser in an executory contract of sale could rescind the sale and recover back the sums paid, in every instance where some part of the property was destroyed by fire and the vendor refused to restore it. Before that result will follow, the property destroyed must be of the material substance of the contract; that part of it which furnished the principal consideration for the purchase price. Such was not the situation here. While the destruction of the buildings caused a considerable loss, the principal and material part of the property remained intact, and it was at least a doubtful question, did nothing more appear, whether the remedy thought applicable was available.

In the next place, the contract between Hurn and Salzer contained clauses to the effect that Hurn himself should bear all loss or damage to the property during the existence of the contract, and that no loss of or damage to the property should operate to extinguish or diminish his liability thereunder. There may be a question whether these conditions applied to all of the property or only to the personal property, but we think no one can read the contract as a whole without reaching the conclusion that there is at least room for a substantial doubt as to its proper construction in this respect. There are, possibly, other reasons which would render it doubtful whether the remedy thought applicable was available, but these mentioned

are sufficient, we think, to show that it would have been. extremely hazardous to his client's interest to have induced him to pursue the suggested remedy.

[2] It is the duty of every attorney, of course, to make known to his client any interest the client may have in the matter concerning which he undertakes to advise him, and he is liable to his client, if he fails in that duty and the client suffers a loss thereby. But it is too much to say that the attorney failed in his duty in this instance. This being so, no recovery can be had against him, based on that ground.

[3] The respondent, in a somewhat extensive brief, contends for other reasons for affirming the judgment, but we shall not follow the argument by which the contentions are sought to be supported. It is enough to say that we do not find the charges of fraud sustained. But we do conclude that it would be inequitable to. permit the appellant to retain the money which he concedes was not accounted for in the settlement.

Our order will be, therefore, that the judgment be reversed, and the cause remanded with instructions to enter a judgment in favor of the respondent Hurn for the sum of $1,208.41; the judgment to bear interest at the statutory rate from the date of its entry.

MACKINTOSH, C. J., MAIN, and ASKREN, JJ., concur.

HOLCOMB, J. (concurring)—I concur with the general result here reached, except that I think interest should be allowed on the recovery from April 21, 1926.