350 S.E.2d 748

James L. **BRYANT** and James E. **Bland**

v.

**WILLISON REAL ESTATE CO.**, etc.

**No. 17124.**

Supreme Court of Appeals of West Virginia.

Nov. 20, 1986.

Stephen A. Wickland, Clarksburg, for appellants.

Boyd L. Warner, Clarksburg, for appellee.

MILLER, Chief Justice:

James L. Bryant and James E. Bland, the plaintiffs who were purchasers under a real estate sales contract, appeal from a judgment of the Circuit Court of Harrison County denying their claim for rescission of the contract and permitting the defendants/vendors to retain their down payment. The trial court also awarded damages against the purchasers for property loss suffered by third parties as a result of water flowing from a broken water line into two adjacent businesses.

This case was heard by the trial court judge without a jury by agreement of the parties. The facts are that on January 4, 1980, the plaintiffs entered into a contract to purchase the O.J. Morrison Building in Clarksburg for $175,000. As required by the sales contract, they paid $10,000 to Willison Real Estate Company, the agent for the vendors, at the time the contract was signed. The balance was to be paid upon delivery of the deed, at which time the purchasers would take possession of the property. No date was set for the closing.

On February 18, 1980, before the delivery of the deed, a water line broke in the sprinkler system, permitting water to run throughout the building and into two adjoining businesses. The purchasers had planned to extensively renovate the building for use as a medical office building. The purchasers were informed by an architect and an engineer who inspected the damage that the remodeling of the Morrison Building could be delayed by as much as four to six weeks because the building had to be properly dried out. The purchasers asked the vendors to correct the water damage or to permit the contract to be rescinded. The vendors declined to repair the damage and sold the building to another purchaser in July of 1980 for $140,000. The purchasers then instituted this action for rescission of the contract and return of their down payment. The trial court ruled that the purchasers must bear the risk of loss both to the Morrison Building and for the water damage to the adjoining property owned by third parties.

The purchasers contend that the trial court placed undue reliance on the doctrine of equitable conversion and rejected language in the sales contract placing the risk of loss on the vendors.[1] Our law on the doctrine of equitable conversion with regard to real estate sales contracts is rather minimal. The doctrine of equitable conversion[2] provides that where an exec-

---

1. The language in the sales contract relied upon by the purchasers is as follows: "It is also understood and agreed that the owner is responsible for said property until the Deed has been delivered to said purchaser."

2. The origins of the doctrine of equitable conversion are traced in 6A R. Powell, Powell on Real Property ¶ 925(6) (1984), where he states that the doctrine was first introduced in "Anglo-American jurisprudence in the landmark English case of *Paine v. Meller*, 6 Vesey Jr. 349, 31 Eng.Rep. 1088 (Ch. 1801)." He points out that it rests on the "concept that 'equity regards as done that which is agreed or ought to be done.'" *Id.* at 84–75. Thus, at the time the real estate contract is signed, the purchaser becomes the equitable owner and the seller retains a right to possession and legal title as security for the payment of the balance of the purchase price. Powell also notes that some courts have rejected the doctrine. *E.g., Anderson v. Yaworski,* 120 Conn. 390, 181 A. 205 (1935); *Libman v. Levenson,* 236 Mass. 221, 128 N.E. 13, 22 A.L.R. 560 (1920); *Skelly Oil Co. v. Ashmore,* 365 S.W.2d 582 (Mo.1963); *Connell v. Savings Bank of Newport,* 47 R.I. 60, 129 A. 803 (1925). Furthermore, Powell points out that several states have adopted the Uniform Vendor and Purchaser Risk Act which generally relieves the purchaser from the contract if he is not in possession and if the property is materially destroyed without fault on the part of the purchaser. The Uniform Act recognizes that risk of loss can be settled by

utory contract for the sale of real property does not contain a provision allocating the risk of loss and the property is damaged by fire or some other casualty not due to the fault or neglect of the vendor,[3] the risk of loss is on the purchaser. This assumes the vendor has good title.

Our main case is *Maudru v. Humphreys*, 83 W.Va. 307, 98 S.E. 259 (1919), where the purchaser was in possession of the property under an executory contract of sale. A fire destroyed a building on the property and this Court found the purchaser to have borne the risk of loss, stating in its single Syllabus:

> "Where a vendor, having good title and capacity to perform, makes a valid enforceable contract for the sale of land and, thereafter and before a deed is executed passing the legal title, a fire destroys a building thereon, without his fault or neglect, the loss is sustained by the purchaser. In such case there is no implied warranty that the condition of the property at the time of sale shall continue until after deed is made."

See also *Biddle Concrete Co. v. McOlvin*, 90 W.Va. 760, 111 S.E. 843 (1922); *Taylor v. Russell*, 65 W.Va. 632, 64 S.E. 923 (1909).

The Court in *Maudru* did not make an extensive analysis of the doctrine of equitable conversion, but did state that "[t]here is no warranty or condition in the contract between Mynes and Maudru that the property should be in the same condition when the transaction is completed as it was when the contract was made." 83 W.Va. at 311, 98 S.E. at 261. This appears to be an implied recognition that the parties may allocate the risk of loss in a sales contract and thereby alter the doctrine of equitable conversion.

It is rather universally recognized that the parties to a contract of sale for real property may allocate the risk of loss for fire or other casualty occurring before the actual transfer of the legal title. If the contract allocates the risk to the vendor, then the doctrine of equitable conversion, which places the risk of loss on the purchaser, is no longer applicable. *E.g., Rector v. Alcorn*, 241 N.W.2d 196 (Iowa 1976); *Coolidge & Sickler, Inc. v. Regn*, 7 N.J. 93, 80 A.2d 554, 27 A.L.R.2d 437 (1951); *Bishop Ryan High School v. Lindberg*, 370 N.W.2d 726 (N.D.1985); *Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643 (Utah 1982); *see also* 77 Am.Jur.2d *Vendor and Purchaser* § 363 (1975); 92 C.J.S. *Vendor & Purchaser* § 295(b)(2) at 176–77 (1955); Annot., 27 A.L.R.2d 444, 459–60 (1953).

The trial court was of the view that the contract language stating that "the owner is responsible for said property until the Deed has been delivered to said purchaser" was not sufficient to cast the responsibility on the vendors. This conclusion was based, in part, on testimony of the sales agent for the vendor that this language pertained only to vandalism.

We disagree with this conclusion. The contract was on a printed form and the language is free from ambiguity. Cases in other jurisdictions have held language of similar import to place the burden of risk of loss on the vendor. *E.g., Rector v. Alcorn, supra; Coolidge & Sickler, Inc. v. Regn, supra; Bishop Ryan High School v. Lindberg, supra.*

To permit this language to be restricted to acts of vandalism cuts across the plain meaning of its wording and would be contrary to the general rule that forecloses oral modification of contract language

---

an express provision in the sales contract. *Id.* at 84–76. He also points out that the *Paine* case setting the doctrine in England has been rejected by the Law of Property Act of 1925. *Id.* at 84–80.

**3.** It would appear that where the risk of loss is on the purchaser and the damage to the property is caused by the negligence of the vendor, the vendor must bear the risk of loss. *E.g., Farrell v. Federal Land Bank of Wichita*, 175 Kan. 786,

267 P.2d 497 (1954); *Horowitz v. Haber*, 37 Misc.2d 1036, 236 N.Y.S.2d 237 (1962); *DuBois v. Nye*, 584 P.2d 823 (Utah 1978); *Osterloh v. Osterloh*, 231 Wis. 319, 285 N.W. 742 (1939); Annot., 22 A.L.R. 575 (1923); 77 Am.Jur.2d *Vendor and Purchaser* § 357 (1975); 92 C.J.S. *Vendor & Purchaser* § 286(a) (1955); M. Friedman, Contracts & Conveyances of Real Property § 4.11 at 438 (4th ed. 1984).

which is free from ambiguity. *Warner v. Haught, Inc.*, 174 W.Va. 722, 329 S.E.2d 88 (1985); *Mundy v. Arcuri*, 165 W.Va. 128, 267 S.E.2d 454 (1980); Syllabus Point 4, *Nettles v. Imperial Distributors, Inc.*, 152 W.Va. 9, 159 S.E.2d 206 (1968); *Wyckoff v. Painter*, 145 W.Va. 310, 115 S.E.2d 80 (1960); *Camden v. McCoy*, 48 W.Va. 377, 37 S.E. 637 (1900).

■ Apparently, the trial court also relied on language in the sales contract which provided: "Purchaser to carry enough fire insurance to protect Self." We do not believe that this provision can be read to place the risk of loss on the purchasers. This provision is nothing more than an acknowledgment of the general rule that both parties to an executory contract for the sale of real property have an insurable interest. *Ambrose v. Harrison Mutual Ins. Ass'n*, 206 N.W.2d 683 (Iowa 1973); *Gilles v. Sprout*, 293 Minn. 53, 196 N.W.2d 612 (1972); *Hatcher v. Harleysville Mutual Ins. Co.*, 266 S.C. 548, 225 S.E.2d 181 (1976); 4 J. Appleman, Insurance Law and Practice § 2181 (1969); 77 Am.Jur.2d *Vendor and Purchaser* § 370 (1975); *cf. Aetna Casualty & Surety Co. v. Cameron Clay Products, Inc.*, 151 W.Va. 269, 151 S.E.2d 305 (1966); *McCutcheon v. Ingraham*, 32 W.Va. 378, 9 S.E. 260 (1889).

■ The trial court also referred to the sentence in the contract that "[t]his contract is also subject to 'As Is' condition" as indicating an intention not to deliver the building in a specific condition. We agree with this conclusion insofar as it would dispel any claim by the purchasers to require the vendors to make any improvements to the building from the condition it was in at the time the contract was signed. There was apparently no dispute that the building had been unoccupied for some period of time and was somewhat deteriorated.

However, we do not agree that this language can be read to remove the risk of loss from the vendors. The purpose of this type of provision is not to shift the risk of loss in the event the building is damaged without fault on the part of either party. Rather the use of an "as is" provision in a real estate sales contract is generally intended to negate the existence of any warranty as to the particular fitness or condition of the property. This type of clause simply means that the purchaser must take the premises covered in the real estate sales contract in its present condition as of the date of the contract. *Universal Investment Co. v. Sahara Motor Inn, Inc.*, 127 Ariz. 213, 619 P.2d 485 (1980); *Lenawee County Bd. of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982); *Approved Properties, Inc. v. City of New York*, 52 Misc.2d 956, 277 N.Y.S.2d 236 (1966); Annot., 97 A.L.R.2d 849 (1964); M. Friedman, Contracts & Conveyances of Real Property § 1.2(n) at 69 (4th ed. 1984).

Having determined that the vendors bore the risk of loss under the contract, we believe the purchasers had the right to obtain the return of the initial down payment once the vendors refused to consider an abatement in the sale price as a result of the water damage and then sold the property to a third party.[4]

■ The particular remedies that may be available where there has been partial destruction or damage to buildings to be sold are not easily categorized as they depend upon particular facts and circumstances. It may be generally stated that where the risk of loss is on the vendor and the casualty damage to the property is not substantial, the purchaser is entitled to sue for specific performance, and the purchase price is abated to the extent the property was damaged. On the other hand where the risk of loss is on the vendor and there is substantial damage to the property, the appropriate remedy ordinarily is to terminate the contract and return the down payment to the purchaser. *See Dixon v. Salvation Army*, 142 Cal.App.3d 463, 191 Cal. Rptr. 111 (1983); *Anderson v. Yaworski*,

---

**4.** It appears that shortly after the water damage occurred, the purchasers, through their attorney, wrote to the vendors' agent on February 26, 1980, asking that the vendors either correct the water damage or permit the contract to be rescinded. This proposal was rejected by a letter of February 27, 1980, from the vendors' agent.

120 Conn. 390, 181 A. 205, 101 A.L.R. 1232 (1935); *Geist v. Lehmann,* 19 Ill.App.3d 557, 312 N.E.2d 42 (1974); *Hawkes v. Kehoe,* 193 Mass. 419, 79 N.E. 766 (1907); *Libman v. Levenson,* 236 Mass. 221, 128 N.E. 13, 22 A.L.R. 560 (1920); *Skelly Oil Co. v. Ashmore,* 365 S.W.2d 582 (Mo.1963); *Cameron v. Hurn,* 147 Wash. 434, 266 P. 179 (1928); 3A A. Corbin, Contracts § 668 (1960); M. Friedman, *supra* at § 4.11. *See generally* Annot., 11 A.L.R.2d at 430 (1950).[5]

We have recognized that a purchaser may have specific performance of his contract to purchase real estate with an abatement in the purchase price where the vendor cannot fully perform his agreement.[6] Syllabus Point 7, *Lathrop v. Columbia Collieries Co.,* 70 W.Va. 58, 73 S.E. 299 (1911); *Cady v. Gale,* 5 W.Va. 547 (1871). However, it appears that we have not had occasion to speak to the remedy where the risk of loss is on the vendor and damage has been done to the building.

■ The purchasers, as we have seen, sued only to recover their down payment. The vendors counterclaimed for the difference in the sales price on the original contract and what they obtained from the subsequent sale of the Morrison Building. The trial court rejected the vendors' counterclaim for reasons that are not entirely clear. However, in view of the risk of loss being placed on the vendors, the trial court's ruling with regard to the vendors' counterclaim would be correct for two reasons.

First, the vendors having the risk of loss for the water damage could not require the purchasers to pay the full purchase price. Consequently, the vendors were wrong in concluding that the purchasers had breached the sales contract when they refused to pay the full purchase price. As a result of this erroneous conclusion, the vendors breached the contract when they sold the property to the third party.[7] If the water damage had not been substantial, the vendors could have sued the purchasers for specific performance while offering an abatement in the purchase price.

As a second alternative, if the vendors had concluded that the damages were substantial, they could have terminated the sales contract and returned the purchasers' down payment. However, with the risk of loss being on the vendors, they would bear the cost of repairing damage to the building.

■ Under the particular facts of this case, we conclude that where a contract places the risk of loss on the vendor and insubstantial damage to the property occurs without the fault of either party, the purchaser may recover his down payment where the vendor refuses to repair the damage or to give an abatement in the purchase price.[8]

■ Finally, we note that with the risk of loss being placed on the vendors, the vendors were not entitled to recover from the purchasers the sums that they had paid to third parties whose adjacent premises were damaged by the water flowing from the vendors' building. The trial court

5. New York's highest court has concluded in *Lucenti v. Cayuga Apartments, Inc.,* 48 N.Y.2d 530, 423 N.Y.S.2d 886, 399 N.E.2d 918 (1979), that where the risk of loss is on the vendor and substantial damage has occurred to the building, the purchaser may obtain specific performance with an abatement in the purchase price. Since the purchasers do not raise the issue of specific performance, we decline to address this issue.

6. This is the general rule elsewhere. *E.g., Miller v. Dyer,* 20 Cal.2d 526, 127 P.2d 901, 141 A.L.R. 1428 (1942); *Kuhlman v. Grimminger,* 213 Neb. 64, 327 N.W.2d 104 (1982); *Arensberg v. Drake,* 693 S.W.2d 588 (Tex.App.1985); *Streater v. White,* 26 Wash.App. 430, 613 P.2d 187 (1980);

11 S. Williston, Contracts § 1346 (3d ed. 1968); 71 Am.Jur.2d *Specific Performance* §§ 129–34 (1973); 17 Michie's Jurisprudence *Specific Performance* § 60 (1979); M. Friedman, *supra,* at § 4.11.

7. For a general discussion of a purchaser's remedies where the vendor transfers property to a third party, *see* 77 Am.Jur.2d *Vendor and Purchaser* §§ 380–86 (1975); 92 C.J.S. *Vendor & Purchaser* § 299 (1955); M. Friedman, *supra* at § 12.2(a)1.

8. We have assumed for purposes of this case that the damages to the building were insubstantial.

**126**

awarded these damages on the basis that the purchasers bore the risk of loss under the doctrine of equitable conversion, which we have found inapplicable because of the terms of the contract.

In conclusion, we observe that we were somewhat handicapped on this appeal because the parties did not supply a transcript of the testimony, but submitted the findings of fact and conclusions of law made by the trial court which were most thorough. It would appear that the purchasers would be entitled to a judgment for the amount of their down payment and interest, but in view of the lack of a complete record, we are reluctant to enter such judgment here. *See* Syllabus Point 5, *Estate of Bayliss by Bowles, Comm'r v. Lee,* 173 W.Va. 299, 315 S.E.2d 406 (1984), *quoting,* Syllabus Point 9, *Bluefield Supply Co. v. Frankel's Appliances, Inc.,* 149 W.Va. 622, 142 S.E.2d 898 (1965).

We, therefore, reverse the judgment of the Circuit Court of Harrison County and remand the case for further proceedings not inconsistent with this opinion.

Reversed and Remanded.