(Decided 2nd December, 1874.)

ISAIAH MEALEY *vs.* WALKER Y. PAGE, Executor of WILLIAM TYLER, deceased.

*Defaulting Purchaser at an Executor's sale, entitled upon a Re-sale of the property, to the Surplus proceeds of Sale, over and above the Cost and expenses of the Re-sale, the Commissions on the amount of the Proceeds thereof, and the amount of Purchase money due on the former sale.*

An executor under and by virtue of a power in the will of his testator, sold certain real estate, and the purchaser signed a written memorandum whereby he agreed and bound himself to comply with the terms of sale upon the ratification thereof by the Orphans' Court. The sale was reported to, and finally ratified by, the Court. The purchaser having made default in complying with the terms of sale. the Court in pursuance of the provisions of the Act of 1870, ch. 82, ordered the property to be re-sold at his risk. The property was accordingly re-sold, and the amount bid at the re-sale exceeded that bid at the first sale. The original purchaser thereupon claimed this excess, or so much thereof as might remain after payment of all proper expenses, cost and charges for which he was liable by reason of his default. This claim was resisted by the executor. HELD:

1st. That as the property at the re-sale was sold as that of the first purchaser, and at his risk, he was entitled to whatever balance might remain of the proceeds of the re-sale, after deducting the costs and expenses attending the

re-sale, including a reasonable fee for services of counsel in filing the peti-
tion and procuring the necessary orders thereon for the re-sale; the execu-
tor's commissions on the whole amount of the proceeds of the re-sale, and
the amount of the original purchase money with interest thereon from the
date of the first sale to the time of the receipt of the purchase money by
the executor from the purchaser at the second sale.

2nd. That the right of the original purchaser to this balance, was not in any
way affected by the fact that he was without means of payment, and had
given no security for the payment of the purchase money, and would have
been unable to pay the loss to the estate of the testator, if the property had
sold at the second sale for less than the amount of the original purchase.

APPEAL from the Orphans' Court of Frederick County.

The appellee, as executor of the last will and testament
of Dr. William Tyler, deceased, in pursuance of the power
contained in the will, and by virtue of an order of the
Orphans' Court of Frederick county, offered at public sale
certain real estate of the decedent. The appellant, was
the highest bidder for a tract called " Long Acre," con-
taining seventy-five acres, and the same was knocked down
to him at the price of $121.50 per acre; the whole purchase
money amounting to $9,112.50. The terms of sale were
" one-third cash, the residue in two equal annual payments,
bearing interest from the day of sale, the purchaser to give
bond with approved security for deferred payments." The
appellant signed immediately after said sale, an acknow-
ledgment of purchase, in which he promised " to comply
with the terms of sale, upon ratification of sale by the
Orphans' Court of Frederick county." He was reported
by the executor as the purchaser, and on the 13th day of
October 1873, the sale was finally ratified by the Court.
On the following day a petition was filed by the executor,
under oath, alleging that the appellant had failed to com-
ply with the terms of sale, and praying for an order re-
quiring him to comply by some certain day. Upon this
petition an order was passed by the Court, requiring the
appellant to comply with the terms of sale, or shew cause

to the contrary on the 21st day of October, 1873. This order was duly served upon the appellant. He failed to comply with the terms of sale, or to shew cause to the contrary, and the Court, on the 23rd of October, 1873, passed an order directing the executor to re-sell said real estate on the terms originally prescribed, or for all cash, at the option of the purchaser. And further ordered, that the same be re-sold at the risk of the appellant. On the 3rd of November, 1873, the appellant and a certain Joseph A. Fleming filed a petition, alleging the former's inability to comply with the terms of sale, and that an order of re-sale had been passed, and praying the Court to rescind the order of re-sale, and to substitute Fleming as purchaser; the petition alleged Fleming's ability to comply, and the appellant's tendered payment of all the costs and expenses which he had incurred, or for which he was legally liable by reason of his default. On the 8th of November, the executor filed an answer to the petition, alleging under oath the appellant's failure to comply with the terms of sale *in every respect,* although compliance had been demanded of him, his failure and utter inability to make the cash payments, or to give good bond for the deferred payments, and that he had no means to make the cash payment—and denying the right of the appellant, who was then in contempt for non-compliance with an order of the Court, to transfer his purchase, and substitute a purchaser after the ratification of the sale and an order of re-sale. Upon the hearing of the petition and answer, on the 11th of November, the Court dismissed the petition.

The farm was re-sold, as directed by the order of the Court, and Joseph A. Fleming became the purchaser at $140.35 per acre, the purchase money amounting to $10,526.25 in the aggregate. The sale was duly reported to, and ratified by the Court. The excess of the second sale over and above the first, was $1,413.75.

On the 20th of December, 1873, the appellant filed a petition setting forth the first sale and the proceedings

thereon, the order for a re-sale and the proceedings preliminary thereto; the petition of the appellant and Fleming, and the proceedings thereon; the second sale and the amount thereof; alleging that the appellant bought the property for the benefit and on account of two of his daughters, who, as it was understood between them and the petitioner, were to furnish the money and security; that they owned considerable property; that a large portion of the funds necessary for the cash payment had been promised to the appellant, on security to be given by his daughters; that the parties from whom said funds were to have been obtained, informed the petitioner that they were prevented from furnishing said funds by the temporary stringency in monetary affairs; and that the same stringency prevented the petitioner from raising the money to comply with the terms of sale. The petition prayed the Court to pass an order declaring the $1413.75, the difference between the first and second sale, to be the property of the petitioner, and to direct the executor to pay over the same, after deducting all expenses, costs and charges for which the petitioner was liable by reason of his default, and for general relief.

To this petition the executor, on the 1st of January, 1874, filed his answer under oath, admitting the sale to the appellant and the ratification thereof; but alleging that he did not know whether or not the appellant purchased on account of his two daughters, or whether or not they had agreed to furnish him the purchase money, and requiring full proof thereof; and further alleging, that the appellant signed the acknowledgment of purchase in his own name, and knowingly permitted the sale to be ratified, he being reported as the purchaser; after the order of re-sale, he filed a petition in his own name, under oath, in connection with J. A. Fleming, in which he declared himself the purchaser, and never intimated that his daughters had any interest in the purchase, until the filing of

the petition claiming the $1413.75. The answer insisted that all the allegations of the petition in regard to the appellant's daughters, were irrelevant, even if true. The answer further alleged, that the respondent knew nothing as to the worth of the daughters, the efforts of the appellant to borrow money, and the causes of his failure to obtain the same, and required full proof thereof, and insisted that the allegations in this respect, whether true or false, were irrelevant. It further alleged the order of re-sale, and the failure of the appellant to shew cause why such order of re-sale should not be passed, and his failure even to appear or resist such order; denied that the appellant tendered to him any part of the cash payment, or of the cost or expenses, alleged that he refused to treat Fleming as a substituted purchaser, because he had been trifled with in every possible way by the appellant, and because after final ratification of the sale, and the passage of an order of re-sale in addition, he had no right to treat with any person as a substituted purchaser. The respondent claimed all the proceeds of the second sale, and insisted that the real estate was re-sold simply at the risk of the appellant, and not as his property, and that the order of re-sale destroyed any inchoate title which he might have acquired by the first sale and the ratification thereof. The answer further alleged that the petitioner was utterly insolvent, and notoriously so, but not so known to be by the respondent at the time of the first sale; that the appellee called upon the appellant time after time, and almost day after day, requesting him to comply with the terms of sale, but that the appellant was utterly unable either to pay the cash payment, or to give notes with surety, for the deferred payments; that the appellant bought merely for speculation, and wanted to retain only one-fifth of the farm, and had no reasonable expectation of paying except by selling the property; and that he disclosed no agency so long as any risk attached.

The respondent insisted that even if he were not entitled to all the proceeds of the second sale, the petition should be dismissed, as the excess over and above the costs, charges and commissions, would belong to the daughters and not to the appellant.

To this answer the appellant filed a general replication. Testimony was taken, and the Court, on the 28th of April, 1874, passed an order dismissing the petition. From this order the present appeal was taken.

The cause was argued before BARTOL, C. J., BRENT and ALVEY, J., and BOWIE and MILLER, J., participated in the decision.

*George K. Shellman,* for the appellant.

From the testimony, it is clear that Mealey purchased in perfect good faith, and had his daughters' property upon which to raise the first payment, and that they were ready and willing to give bonds with good security; he is therefore a *bona fide* purchaser and entitled to be treated as such, notwithstanding that from circumstances beyond his control, he could not receive the money in time.

The land was regularly sold to the appellant at public sale, and the appellee waived his right to demand the first payment in cash, and gave the appellant time until the ratification. It was ratified and afterwards re-sold to pay the purchase money. This is merely a summary mode given by the Act of Assembly, of collecting the purchase money.

Mealey was bound to make good the price he had bid on the property, and when that was done, the executor had got all he was entitled to except the additional expenses consequent upon the re-sale.

All the decisions speak of the re-sale as being the enforcement of the lien for the payment of the purchase money. *Gordon vs. Matthews,* 30 *Md.,* 244; *Andrews vs.*

*Scotton*, 2 *Bland*, 656, 657, 663, 664, 669, 670, 672; *Simmons vs. Tongue*, 3 *Bland*, 341, 348; *Stephens and Crain vs. Magruder*, 31 *Md*., 168.

There does not appear to be any case in which more was claimed than the full payment of the purchase money at the first sale, and the additional expenses of the re-sale.

The power given to the Orphans' Court to order a re-sale, is the same as that given to Courts of Equity, *Act of* 1870, *ch*. 82. This limits the power of the Courts in cases of re-sales; and the decisions speak of it as a power *to enforce payment of the purchase money of the first sale*.

The whole matter is, that the appellant had bought the land *bona fide*, and had not paid for it, and the land was re-sold to enforce payment of the price for which he had bought it, and the additional expenses resulting from his default, as all the cases say. The case of *Andrews vs. Scotton*, 2 *Bland*, 669, says: "That the equitable lien for the purchase money is in the nature of a mortgage." If then, the lien for the purchase money is in the nature of a mortgage, and the land is resold to enforce it, to what extent does it go? Clearly, only to the collection of the debt due, and the costs and expenses, and not to a speculation upon the purchaser, by taking not only the debt due, and expenses, but the whole that the re-sale of the land produces, if it brings more than the debts and expenses, and at the same time holding him liable, if the land does not bring enough to pay in full. This would, indeed, be *one-sided justice*.

The appellee chose to accept the appellant as purchaser, by *waiving his right to demand the cash payment on the day of sale*, and having the sale ratified; and the appellant's case must be treated like those of all other purchasers who fail to comply with the terms of sale.

If a man purchase property with the positive assurance that persons who have the necessary means will go his security, he is a *bona fide* purchaser, as much so as if he

had his own property to raise the money and security upon. This is what the purchasing by the appellant in his own name amounts to in this case. The appellee clearly had the legal right to re-sell under his order, and by this summary remedy to realize the purchase money contracted for by the appellant, and the costs and charges resulting from his default, and the balance as clearly belongs to the appellant.

*C. V. S. Levy*, for the appellee.

The contest is to whom does the excess of the proceeds of the second sale, over and above the proceeds of the first, belong? It is admitted that all the costs of the second sale must first be deducted therefrom.

The executor's legal fee for filing his petition against the delinquent purchaser, and such commissions on the proceeds of the second sale, as the Court may allow within the limits fixed by law, are also to be deducted from said sum. *Alexander's Chan. Prac.*, 148 ; *Farmers and Planters' Bank vs. Martin and Travers*, 7 *Md.*, 345.

The appellant was utterly insolvent. The fact of his insolvency, and his known irresponsibility as a bidder, injured the first sale ; kept parties from bidding, and prevented the property from bringing what it would otherwise have brought. His inability to borrow was not due to any financial stringency, but to his known irresponsibility. The purchase upon his part was merely speculative. He only wanted eighteen acres ; thought he saw there was money in the purchase, and expected to manage the purchase by selling all except the eighteen acres for as much as his bid for the whole, and was entirely destitute of the means of compliance except by such sale.

The agency alleged between the appellant and his daughters, cannot affect this controversy. There was no intimation in any of the proceedings of such agency, until after the re-sale, and the appellant filed his petition, claiming

the excess over and above the first sale, less the proper costs, expenses and charges for which he was liable by reason of his default.

The order of re-sale passed by the Court, is not such as is passed where the property is sold, simply to compel the purchaser to comply. In such case the order is, that the property "be sold for the payment of the purchase money thereof, and the interest thereon, and the costs of these proceedings," &c. *Alexander's Ch. Pr.*, 322.

And the Court, in disposing of this controversy in their order, say, that they never intended by their order of re-sale to direct the property to be sold, as that of the appellant for the payment of the purchase money. The order of re-sale simply directed the executor to *re-sell the property* on the original terms, or for all cash, at the option of the purchaser, and then added the clause, that the sale be at the risk of the appellant.

This order did not treat the real estate as the property of the appellant, and direct it to be sold as such, but ordered simply that the sale be at his risk. If the property at the second sale brought as much or more than the first, then the risk was over. If it brought less, then the risk attached. The risk was simply in the nature of a penalty imposed upon the appellant for his failure to comply, his trifling with the executor and the Court, and his contempt of Court in disobeying the order to comply. Practically the risk was nothing, because he was insolvent, had not entered upon the performance of his contract by paying anything; or by giving his notes, and up to that time never disclosed his agency, if there was any agency in fact. In England, the practice is to require a deposit at the time of bidding, and in case of an insolvent purchaser failing to comply, or of a purchaser having no means to comply, the sale is annulled, the deposit is forfeited, and a re-sale ordered. *Andrews vs. Scotton*, 2 *Bland*, 648; *Anderson vs. Foulke*, 2 *H. & G.*, 359.

We cannot see upon what principle an insolvent purchaser in contempt, who has done nothing under his contract, but has disregarded and ignored it in every respect, can claim any part of the proceeds of the property, if the executor, or the Court, as the vendor, sells it again, and happens to get more for it. Such a purchaser has forfeited all his rights under the contract. The opposite construction would offer a premium for bad faith and disobedience of the order of the Court, and would incite insolvents and men of doubtful responsibility to bid upon property, keep others from bidding who are responsible, fail to comply and profit by a second and better sale.

The Act of 1870, chapter 82, which authorizes the Orphans' Court to pass an order of re-sale at the risk of the first purchaser, is, in substance, the same as section 131 of Article 16 of the Code, in regard to trustees' sales, which is the same as the Act of 1841, chapter 216.

These Acts give no countenance to the idea that a non-complying purchaser is regarded as the owner of the estate sold by a trustee or executor. They authorize a re-sale of the property at his risk, but not as his property, on the contrary, the order which the Court is authorized to pass by these Acts, and the order which was in fact passed in this case, is a revocation of the order confirming the sale, and denying inchoate title, which the first purchaser may have acquired by the confirmation. *Dalrymple vs. Taney-hill*, 4 *Md. Ch. Dec.*, 175.

The appellant treats the re-sale as the sale of his property, and as based upon an equitable lien retained by the executor or Court, as the vendor. The ratification does not complete the sale, or vest any title, without a compliance with the terms.

If, then, the order of re-sale, when nothing has been done under the contract, and a compliance with the terms has been demanded by a preliminary order, be a revocation of the order confirming the sale, it is such an annulling

of the contract as permits, under the statute, the executor or Court, as the vendor, to re-sell the property at the risk of the first purchaser, and not as his property. Just as a vendor at Common Law, if the goods, upon request, be not paid for and taken in a reasonable time, or at the time when they are contracted to be paid for and taken, may re-sell them and keep all the proceeds of sale, if they be more than was agreed to be paid for them.

So may the executor or the Court, as the vendor, re-sell the property, retain the proceeds of sale, if they be more than was bid at the first sale, and if less, require the first purchaser to pay the deficiency, as a penalty for his bad faith and his contempt of Court—which is equivalent to the forfeiture of the deposit under the English practice.

Where a portion of the purchase money has been paid, an equitable lien exists for the payment of the balance, whether the legal title has passed or not. Where none has been paid, and none secured to be paid by note or otherwise, such lien may exist if the legal title has passed; or though the legal title may not have passed, if there has been partial performance of the contract of sale, such as delivery of possession, there must be something to which the lien attaches. In this case no money has been paid, or secured to be paid by the appellant; possession had not been delivered, and nothing had been done under the contract. There was no part performance of any kind. The *legal* title had not passed, because there had been no compliance with the terms, and the whole purchase money was unpaid. The appellant had no *equitable* title, because he had paid no money, and there had been even no part performance of the contract. He had no title of any kind. The order of re-sale revoked the order of ratification, and destroyed whatever inchoate title there may have been. To what then did the lien attach? To property to which the appellant had not a particle of title, either legal or equitable, and of which he never had possession or the

right of possession. The appellant clearly has no claim, equitable or legal, to the money he seeks.

Alvey, J., delivered the opinion of the Court.

In this case, the original sale having been made by the executor, under and by virtue of a power in the will of the testator, and the purchaser having signed a written memorandum of sale, whereby he agreed and bound himself to comply with the terms of sale upon the ratification thereof by the Orphans' Court; and the sale having been reported and finally ratified, and the purchaser making default in complying with the terms of sale, whereupon the Court, in pursuance of the provisions of the Act of 1870, chapter 82, ordered the property to be re-sold at the risk of the defaulting purchaser, and the amount bid at the re-sale exceeding that bid at the first sale, the question is, to whom does the excess belong? This depends upon another question, and that is, whether the property sold at the re-sale was sold as the property of the first purchaser, or as that belonging to the estate of the testator, without reference to any rights or liabilities growing out of the first sale.

The first sale was not set aside, nor was it asked to be set aside; but, on the contrary, all the proceedings leading to the order for re-sale, treated and regarded the first contract of sale as subsisting and binding on the original purchaser. It was in default of his compliance with the terms of sale, and as a summary mode of enforcing the contract of sale, that the re-sale was ordered. The re-sale was at the risk of the original purchaser, precisely as it would have been if the executor, instead of resorting to the summary remedy, had filed an original bill in equity for the enforcement of the contract and a sale of the property for the payment of the purchase money. In such case, the sale decreed for payment of purchase money would have been at the risk of the original purchaser, and the property

would have been sold as his, and any surplus proceeds of sale, after payment of the costs and expenses attending the second sale, and the commissions on the amount of the proceeds thereof, and the amount of purchase money, with interest due on the first sale, would properly belong to the first purchaser; and if the proceeds of such re-sale, after the deduction for costs, expenses and commissions, had been insufficient to pay the amount due on the first purchase, the original purchaser would have remained liable for any balance that might have been left unpaid. So here, in this summary proceeding, the same result is produced. The property was sold as that of the original purchaser, and at his risk, he being entitled to any excess in the proceeds of sale, over and above the costs and expenses of the re-sale, the commissions on the amount of the proceeds thereof, and the amount of the purchase money due on former sale; and in the event that the property had sold for an amount less than sufficient to pay all these, he would have remained liable for the balance, and been subject to summary proceeding for the collection thereof. This is the nature of the summary proceeding for re-sale in a Court of Equity, (7 *Md.*, 342; 30 *Md.*, 235; 31 *Md.*, 168,) and it seems to have been the object of the Act of 1870, chapter 82, to adopt the same proceeding in regard to sales of real or leasehold estates made under the jurisdiction of the Orphans' Court.

It has been contended by the appellee that, because the appellant was without means of payment, and had given no security for the payment of the purchase money, his claim to the excess of the purchase money, realized on the re-sale over the amount bid by himself at the first sale, ought not to be maintained, as thereby he would be allowed to speculate upon and take advantage of the event that the property produced more on the second than on the first sale, while if it had been the reverse he would have paid nothing, and the loss in the difference of price would have

been sustained by the estate represented by the appellee. It is even contended that the appellant never, in fact, intended to pay for the property, and that his conduct in regard to the sale was in truth but a fraudulent device whereby to enable him to speculate upon the chances of re-sale. But, be this as it may, it cannot affect the present claim of the appellant. The grounds alleged against the appellant's claim may have formed very sufficient reasons for rejecting or refusing to ratify the sale made to him; but as that sale was allowed to be finally ratified by the Court, the appellant is entitled to occupy the position of purchaser of the property. Trustees and executors can easily, and should, protect themselves, and the estates they represent, from such imposition and practices as the appellee alleges here, by observing with strictness the powers under which they act. They can, and should, in all cases where there are doubts of the good faith, or solvency of the purchaser, require security for the compliance with the terms of sale, and that before the sale is ratified. By observing this precaution all danger of imposition, such as is here complained of, is at once effectually avoided.

Instead of rejecting altogether the appellant's claim to the surplus proceeds of the re-sale, the Orphans' Court should have disposed of the product of that sale in the following manner: First, by deducting the costs and expenses attending the re-sale, including a reasonable fee for services of counsel in filing petition and procuring the necessary orders thereon for re-sale; secondly, by deducting the executor's commissions on the whole amount of the proceeds of the re-sale; thirdly, then the amount of the original purchase money, with interest thereon from the date of the first sale to the time of the receipt of the purchase money by the executor from the purchaser at the second sale; and lastly, after all these deductions, whatever balance of such proceeds of re-sale may have remained, should

have been awarded to the appellant. And in order that such disposition of the fund may be made, we shall reverse the order appealed from, and remand the cause to the Orphans' Court.

*Order reversed, and*
*cause remanded.*

(Decided 3rd December, 1874.)