831 A.2d 517

**Elizabeth A. WHITE, et al.**

v.

**David J. SIMARD.**

**No. 1152, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 5, 2003.

Worthington H. Talcott, Jr. (Ashley Joel Gardner, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Rockville, for appellant.

George Z. Petros, Camp Springs, for appellee.

Argued before ADKINS, KRAUSER and GREENE, JJ.

ADKINS, J.

In this case of first impression, we are asked to decide whether parties to a power of sale foreclosure may "contract out" of the common law rule that the defaulting purchaser is entitled to any surplus proceeds of resale. Elizabeth A. White, Nancy P. Regelin, and Patrick M. Martyn, Substitute

Trustees ("Trustees"), and Washington Mutual Bank, FA, successor to Home Savings of America, F.S.B. ("Lender"), appellants/cross-appellees, challenge the decision of the Circuit Court for Prince George's County sustaining the exceptions of David J. Simard, appellee/cross-appellant, to an Auditor's Report following a foreclosure sale of real property. Together, through their cross-appeals, the parties present the following issues for our review:

> I. Did the circuit court err in ruling that Simard, the defaulting purchaser, was entitled to the surplus proceeds from the resale notwithstanding a contrary provision in the advertised terms of sale?

> II. Did the circuit court err in awarding the Lender and Trustees attorney's fees on the restated account of the auditor?

We hold that the circuit court erred in ruling that Simard was entitled to the surplus proceeds of the resale of the property. Therefore, we reverse the judgment of the circuit court on this basis. Because Simard failed to take exception to the Restated Account of the auditor that credited the Trustees and Lender with $11,951.75 in attorney's fees, we will not address his challenge to those fees in this appeal.

## FACTS AND LEGAL PROCEEDINGS

Beginning on April 1, 1999, the Trustees advertised, in a local newspaper of general circulation, the sale of improved fee-simple property located at 5511 Fisher Road in Prince George's County. The sale was to be held on the steps of the Prince George's County Courthouse on the morning of April 20. Under a section entitled "Terms Of Sale," the advertisement announced that:

> **This advertisement, as amended or supplemented by any oral announcements during the conduct of the sale, constitutes the Substitute Trustees' entire terms upon which such premises shall be offered for sale.**
>
> * * *
>
> The purchaser shall comply with the terms of sale within ten (10) days after ratification thereof by the Circuit

Court.... If the purchaser shall fail to comply with the terms of the sale or fails to go to settlement, in addition to any other available legal or equitable remedies, the Substitute Trustee may declare the entire deposit forfeited and resell the premises at the risk and cost of the defaulting purchaser. In such event, the defaulting purchaser shall be liable for the payment of any deficiency in the purchase price, all costs and expenses of sale, reasonable attorney's fees, all other charges due and incidental and consequential damages. **The purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property.** If the Substitute Trustees cannot convey insurable title, purchaser's sole remedy at law or in equity shall be the return of the deposit. (Emphasis added.)

Simard made the winning $53,000 bid at the April 20 sale. On that date, Simard signed a "Memorandum of Purchase at Public Auction," in which he certified: "I, the undersigned purchaser, hereby acknowledge that I ... have this day purchased the property described in the attached advertisement, subject to the conditions stated therein[.]" The circuit court ratified the sale on September 24, 1999.[1] The net proceeds of this sale were insufficient to pay the secured debt and accrued interest, and left a $51,424.34 deficiency on the mortgage account.

Simard defaulted on his purchase of the subject property by not completing settlement within ten days after ratification of the sale. Therefore, on December 10, 1999, as authorized by Md. Rule 14–305(g), the court issued an Order Directing Resale Of Mortgaged Property At Risk And Cost Of Defaulting Purchaser. The Trustees placed a second advertisement of sale in a local newspaper of general circulation, setting forth terms identical to those outlined in the first advertisement of sale. At the February 22, 2000 resale, Simard again made the winning bid on the property, this time bidding $101,141. He

---

1. No exceptions were taken to the sale. *See* Md. Rule 14–305 (procedure following sale).

again signed a "Memorandum of Purchase at Public Auction" after the February 22 sale. The court ratified the resale in April of that year. Again, no exceptions were taken to the sale.

Simard again failed to timely complete settlement. On May 26, 2000, Simard filed in the circuit court a Petition To Substitute Purchasers, stating that he had assigned his rights as purchaser to Jose W. Barias and Daysi Y. Alverenga ("the Substitute Purchasers"), who had agreed to proceed to settlement on the property. He agreed to retain primary responsibility for "all liabilities in connection with the performance of their contract to purchase the property, and for compliance with the terms of the sale as set forth in the Trustee's Notice of Sale[.]" The court granted his petition on May 26, and the Substitute Purchasers consummated the purchase.

Thereafter, the court referred the matter to an auditor to state an account. *See* Md. Rule 14–305(f). In his August 2, 2000 report, the auditor stated that the resale of the property had produced a surplus profit of $46,831.29, and authorized payment of this surplus to the mortgage account. *See* Md. Rule 2–543(e). Although the auditor recognized that the defaulting purchaser generally would be entitled to this surplus under Maryland law, the auditor pointed to the term of sale specified in the advertisement, which expressly provided that "the purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property." The auditor explained:

In foreclosure sales, the advertisement of sale becomes the contract between the trustees and the foreclosure purchaser, and the "terms of sale" specified in said advertisement become binding between them. As a result of this agreement, the surplus proceeds resulting from the resale have been applied to the mortgage debt as opposed to being awarded to the defaulting purchaser.

Simard filed exceptions to the auditor's report in the circuit court. At hearings on his exceptions, Simard claimed that the property's higher resale price was due to improvements he made to that property before the second sale. The Lender

and Trustees disputed Simard's claim. The circuit court sustained Simard's exceptions, ruling that the "surplus proceeds" provision in the advertisement of sale was

> contrary to the Maryland law governing said circumstance and ... no valid consideration existed for the forfeiture of the right of surplus to which the defaulting purchaser would otherwise be entitled. The Court further finds that the language contained in the advertisement cannot operate to alter the princip[les] of law governing entitlement to surplus and that to so allow would be a contract of adhesion and can have a chilling effect on securing foreclosure bids.

The court remanded the matter to the auditor "to re-state his account in accordance with" the circuit court's ruling. The auditor's re-stated account not only credited Simard with the surplus proceeds, but also awarded the Lender and Trustees $11,951.75 in attorney's fees in connection with Simard's exceptions. The Lender and Trustees filed exceptions to the auditor's restated account,[2] and moved "for authorization to pay surplus into registry of the court," rather than directly to Simard.

In a July 9, 2001 order, the court ratified the auditor's restated account, thereby denying the Lender's and Trustees' exceptions, and granted the latter's motion. By separate order dated the same day, the court directed the auditor to allow the Lender and Trustees $11,951.75 in attorney's fees "in connection with the exceptions to the Auditor's Report." The parties thereafter noted these cross-appeals.

## DISCUSSION

### I.

### Entitlement To Surplus Proceeds Of Resale

■ It is a well-established principle in Maryland that the defaulting purchaser generally is entitled to the surplus pro-

---

2. In their reply brief, the Trustees assert that they filed these exceptions "to preserve their arguments regarding application of the surplus for appeal."

ceeds from a resale due to a foreclosure. *See Werner v. Clark*, 108 Md. 627, 633, 71 A. 305 (1908); *Aukam v. Zantzinger*, 94 Md. 421, 428, 51 A. 93 (1902); *Early v. Dorsett*, 45 Md. 462, 466 (1877); *Mealey v. Page*, 41 Md. 172, 183–84 (1874). Although the cases establishing this rule are roughly a century old, the rule is generally recognized in modern legal literature. *See* Alexander Gordon, IV, *Gordon on Maryland Foreclosures* ("*Gordon*"), § 28.02 at 840 (3d ed. 1994)("In the event that the property sells for more at the subsequent sale, the additional revenues will first be credited against the additional expenses, but a balance remaining goes to the defaulting purchaser at the first sale, *not* to the mortgaged account"). Despite this legal tradition, the Lender and Trustees contend that parties may expressly "contract out" of this rule by agreeing to shift the benefit of any surplus on a resale to the mortgage account. Although we find no precedent concerning the enforceability of such an agreement, we agree with the Lender and Trustees for the reasons set forth below.

## Contract Principles Applied To Judicial Sales

The public sale in this case was instituted in accordance with a power of sale in a 1993 deed of trust. Paragraph 24 of that deed of trust authorized the Trustee to sell the property at public auction upon default. "The power of sale is derived exclusively from the agreement and contract of the parties to the mortgage." Edgar G. Miller, Jr., *Equity Procedure*, § 454 at 536 (1897)("*Miller*"); *see Waters v. Prettyman*, 165 Md. 70, 75, 166 A. 431 (1933). Such contractual provisions conferring a power of sale upon the Trustee are governed by Md.Code (1974, 2003 Repl.Vol.), section 7–105(a) of the Real Property Article ("RP")("A provision may be inserted in a mortgage or deed of trust authorizing any natural person named in the instrument, including the secured party, to sell the property or declaring the borrower's assent to the passing of a decree for the sale of the property, on default in a condition on which the mortgage or deed of trust provides that a sale may be made").

■ The purchase and sale transaction at any judicial sale is governed by general principles of contract, with the court acting as vendor:

"In all sales made under the authority of a decree of a court of equity, the court is the vendor, acting for and in behalf of all parties interested. The contract of sale is a transaction between the court as vendor, and the purchaser; and the contract is never regarded as consummated until it has received the sanction of the court...." "Before ratification the transaction is merely an offer to purchase which has not been accepted."

*Talbert v. Seek*, 210 Md. 34, 43, 122 A.2d 469 (1956)(quoting *Miller*, § 510 at 602, and *Hanover Fire Ins. Co. v. Alexander Brown & Sons*, 77 Md. 64, 71, 25 A. 989 (1893)); *see also McCann v. McGinnis*, 257 Md. 499, 505, 263 A.2d 536 (1970)("The court is the vendor in the case of a sale under the power contained in a mortgage, just as it is a vendor in any other chancery sale").

■ Trustees acting under a power of sale contained in a deed of trust have discretion to outline the manner and terms of sale, provided their actions are consistent with the deed of trust [3] and the goal of securing the best obtainable price:

While the discretion in the manner and terms of sale, lodged in the trustee under the terms of the deed of trust, is contractual, and gives a wider latitude to the trustee than that ordinarily allowed trustees making sales under orders or decrees of the court, yet such discretion has never been held to be unlimited. When a sale thus made is attacked, it must be shown that the trustee did not abuse the discretion reposed in him, and that the sale was made under such circumstances as might be fairly calculated to bring the best obtainable price. **The trustee not only represents the holder of the note secured by the deed of trust, but also the owners of the property, who would be entitled to any**

---

3. Here, the deed of trust did not specify the terms of sale, other than to state that the sale must be "for cash ..., payable at time of sale[.]"

**surplus remaining after the payment of expenses and the note secured by the deed of trust.** The power of sale is derived from the contract of the parties contained in the deed of trust, but the report of the sale must be made to and ratified by the court before a deed for the property is given by the trustee to the purchaser. Upon the sale being reported to the court, it assumes jurisdiction and permits those interested in the sale or the proceeds thereof to file objections to its ratification. Upon such being filed, it is the duty of the court, in order to ratify the sale, to ascertain that it was fairly made and under such circumstances and conditions as might be reasonably expected to have produced the largest price obtainable.

*Waters,* 165 Md. at 75, 166 A. 431 (emphasis added); *see also Miller,* § 456 at 538 (mortgagee acting under power of sale "acts not for himself alone, but as a fiduciary, and for the benefit of all parties interested in the proceedings").

▆▆▆▆ In the context of a foreclosure sale, the contract of sale is not final until the court ratifies the sale. Such a sale does not pass the title unless it is ratified and confirmed. The [c]ourt is the vendor acting through its agent the trustee.... He reports to the [c]ourt the offer of the bidder for the property; if the offer is accepted, the sale is ratified, and thereupon, and not sooner, the contract of sale becomes complete. Before ratification the transaction is merely an offer to purchase which has not been accepted.

*Hanover Fire Ins. Co.,* 77 Md. at 71, 25 A. 989; *see also Plaza Corp. v. Alban Tractor Co., Inc.,* 219 Md. 570, 578, 151 A.2d 170 (1959)("When [the trustee] reported the offers of the bidders for the property to the court, no contracts of sale had been completed and no title had been transferred to the prospective purchasers"); *Four Star Enters. Ltd. P'ship v. Council of Unit Owners of Carousel Ctr. Condo., Inc.,* 132 Md.App. 551, 563–64, 752 A.2d 1272 (2000)("It has long been the rule in Maryland that foreclosure sales are not final prior to court approval"). Until the sale by the trustee is ratified by the court, it stands as merely an executory contract. *See*

*Talbert,* 210 Md. at 43, 122 A.2d 469 (citing *Miller,* § 510 at 602).

### Equitable Title In Purchaser

 Once the foreclosure sale is ratified, the original purchaser becomes the equitable owner of the property:

When the sale is finally ratified, the purchaser's inchoate equitable title, acquired at the time of the acceptance of his offer by the trustee, becomes complete and the purchaser's equitable title is established retroactively to the time of the original acceptance of the offer by the trustee. The purchaser is entitled to the rents and profits of the land sold as he has become the substantial owner of the property. He is not only entitled to possession of the property, but it remains at his risk, even though legal title may not be conveyed.

*Merryman v. Bremmer,* 250 Md. 1, 8, 241 A.2d 558 (1968) (citations omitted); *see Maas v. Lucas,* 29 Md.App. 521, 531, 349 A.2d 655 (1975); *Continental Trust Co. v. Balto. Refrigerating & Heating Co.,* 120 Md. 450, 456–57, 87 A. 947 (1913). Moreover, defaulting in payment of the purchase price does not cause him to lose this equitable title. *See Merryman,* 250 Md. at 12, 241 A.2d 558 (after ratification, purchaser maintained right to pay purchase price in return for deed despite 20 year delay, when trustee never petitioned court to set aside sale or compel a resale at his expense).

We perceive a lack of clarity in the Maryland cases as to what happens to a defaulting purchaser's equitable title after a resale is ordered. *Compare Werner,* 108 Md. at 633, 71 A. 305 (order for resale is revocation of the order confirming the first sale) *with Continental Trust Co.,* 120 Md. at 456, 87 A. 947 (suggesting that equitable title held by first purchaser entitles him to surplus at second sale, and viewing resale as enforcement of bidder's contract at first sale).

 Regardless of who owns equitable title after an order for re-sale, the cases agree that the nature of a resale is different from the first sale, because the property is sold

not as a new, distinct, independent procedure, but as a means and solely as a means to realize the money which the original but defaulting purchaser failed to pay. The resale ... is made with a view to pay off the same indebtedness for the payment of which the property was sold in the first instance, and the money realized by it is always applied *precisely as would have been applied the money bid at the original* sale had that money *been paid by the first purchaser.*

*Werner,* 108 Md. at 635, 71 A. 305 (emphasis in original); *see also Continental Trust Co.,* 120 Md. at 457, 87 A. 947 (recognizing " '[t]he summary proceeding against a defaulting purchaser to obtain an order of re-sale at his risk' " as being " 'grounded upon the equitable lien held and controlled by the [c]ourt as vendor of the property, for the benefit of those interested in the proceeds of sale' ")(quoting *Schaefer v. O'Brien,* 49 Md. 253, 256 (1878)).

### Advertisement Of Sale

Before selling the property at public auction, a trustee must publish an advertisement or notice of sale in a local newspaper of general circulation. *See* Md. Rule 14–303(b). This notice must set forth "the time, place, and **terms of sale**[.]" *See id.* (emphasis added).

These terms of sale become part of the contract that is made when the sale is ratified. *See, e.g., Donald v. Chaney,* 302 Md. 465, 477–78, 488 A.2d 971 (1985)(in foreclosure sale, terms of sale contained in advertisement of sale became binding and enforceable upon ratification). The contractual offer and acceptance phase of a foreclosure sale is analogous to the offer and acceptance phase of a private auction. Corbin explains the offer and acceptance process of an auction or other solicited offer:

Sometimes the expressions of a ... soliciting agent amount to no more than an invitation to submit an offer. The solicitor may be authorized neither to make an offer nor to accept one. In such a case, an order for goods given by the

solicited customer is a mere offer, even though it clearly states all the terms and even though it is on a printed form supplied by the solicitor's own principal.

1–4 *Corbin on Contracts* § 2.3 (2003). In this situation, the terms of the advertisement are incorporated into any bid that is made. *See Restatement (Second) of Contracts ("Restatement")* § 28(2) (1981)("Unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, posting or other publication of which bidders are or should be aware, as modified by any announcement made by the auctioneer when the goods are put up").

 Although Simard is correct that an advertisement of sale itself is not a contract, such an advertisement does set forth the terms that later will be embodied in the contract of sale upon acceptance of a bid by the trustee (forming an executory contract), contingent upon ratification of that contract of sale by the court. *See Donald,* 302 Md. at 477, 488 A.2d 971. In effect, by choosing to bid on the property at the public sale, a bidder "offers" to purchase the property under the express terms advertised by the trustee. In other words,

bidders are or should be aware of terms … published or announced. A bid need not repeat such term[s]; it is understood as embodying them. Hence the bidder is held to the published or announced terms even though he may have neglected to read them or may have arrived at the auction after the announcement was made.

*Restatement* § 28 cmt. e (emphasis added); *see, e.g., Kendall v. Boyer,* 144 Iowa 303, 122 N.W. 941, 941 (1909)(terms of sale announced by auctioneer at start of public auction "became binding on plaintiff as purchaser, whether he knew of it or not"). *See also Winterstein v. Wilcom,* 16 Md.App. 130, 136, 293 A.2d 821 (1972)("if [the person] did not know of the [exculpatory clause] in his contract **and a reasonable person in his position would not have known of it,** it is not binding upon him").

After making the highest bid at both the initial and subsequent public auctions, Simard signed a "Memorandum Of

Purchase At Public Auction."[4] This memorandum explicitly secured Simard's agreement to the terms of sale outlined in the advertisement of sale. It served, in essence, as the contract of sale, which became fully effective upon the court's subsequent ratification of the sale.

Although a bidder at a judicial sale will not be obligated to comply with terms of purchase that are inequitable to him, he will be held to terms that are known to him. *See Stewart v. Devries*, 81 Md. 525, 526–27, 32 A. 285 (1895)(purchaser at trustee's sale who knew of alleged defect in title of property is not entitled to except to ratification of sale on that ground). In other words, a purchaser's knowledge of adverse terms is a primary consideration in determining what is equitable. As the Court of Appeals explained in *Stewart,*

> [i]t is well settled in this State that a trustee appointed by a Court of Equity is the agent of the Court, and hence, if the question be raised in due time, the Court will see that no undue advantage is taken of the purchaser, and he will not be compelled to comply with the terms of a sale if it would be inequitable for him to do so, especially if there has been any misrepresentation, intentional or otherwise, by the trustee. That rule is necessary for the purposes of justice, as well as to encourage bidding at trustees' sales. **But, when a purchase is made by one who is cognizant of all the essential facts necessary to enable him to understand what the trustee is selling, the Court should be equally zealous in protecting the rights of those interested in the proceeds of the sale of the property, and in not permitting its agent, the trustee, to be trifled with.**

*Id.* at 526–27, 32 A. 285 (emphasis added).

Because the now contested term of sale was properly advertised in the notice of sale, we assume that Simard had at

---

4. A printed copy of the advertisement of sale, complete with the terms of sale, is attached to the right hand side of the Memorandum Of Purchase.

least constructive knowledge of that term when he bid on the property. He expressly reaffirmed his agreement to abide by that term of sale when he signed the Memorandum of Purchase. Thus, we hold that Simard was "cognizant of all the essential facts necessary to enable him to understand what the trustee [was] selling" when he bid on the property. *See id.* Although, in the absence of an express provision to the contrary in the terms of sale, Simard would have been entitled to the surplus proceeds of resale under Maryland common law, we hold that he may bargain away that entitlement, as he did here.

### Simard's Status As Holder Of Equitable Title

We are not dissuaded from our view by the fact that Simard still may have held equitable title to the property at the time of the February 22, 2000 resale.[5] Simard's status as equitable title holder derives from the doctrine of equitable conversion, which " 'is a theoretical change of property from realty to personalty, or *vice versa*, in order that **the intention of the parties,** in the case of a contract of sale . . . **may be given effect.'** " *DeShields v. Broadwater,* 338 Md. 422, 437, 659 A.2d 300 (1995) (citation omitted). This theoretical change of property rests on a familiar equitable doctrine:

> "The legal cliche, that **equity treats that as being done which should be done,** is the basis of the theory of equitable conversion. Hence, when the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, the vendor of the purchase money."

*Id.* (emphasis added). Thus, the determination of title, a real estate law concept, is governed by contract law—what the parties to the transaction intended. Here, the parties' intent was expressed unequivocally in the advertisement that stated the terms of the contract and, by incorporation, the Memorandum of Purchase, both of which provided that if Simard

---

**5.** *See* discussion, *infra,* reflecting lack of clarity as to whether the order of sale revokes that title.

defaulted, he would not be entitled to any "surplus proceeds or profits resulting upon any resale."

 "As a general rule, parties are free to contract as they wish." *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643, 516 A.2d 586 (1986). More specifically, parties are free to contract away rights and consequences that normally would flow from the shift in equitable title arising from a contract. A familiar example is a contract to shift the risk of loss by casualty occurring before settlement. As the Supreme Court of Appeals of West Virginia explained:

> It is rather universally recognized that the parties to a contract of sale for real property may allocate the risk of loss for fire or other casualty occurring before the actual transfer of the legal title.... If the contract allocates the risk to the vendor, then the doctrine of equitable conversion, which places the risk of loss on the purchaser, is no longer applicable.

*Bryant v. Willison Real Estate Co.*, 177 W.Va. 120, 350 S.E.2d 748, 751 (1986). *Accord Utah State Med. Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 644–45 (Utah 1982); *Rector v. Alcorn*, 241 N.W.2d 196, 200–201 (Iowa 1976); *Coolidge & Sickler, Inc. v. Regn*, 7 N.J. 93, 80 A.2d 554, 557 (1951).

### Circuit Court Rationale

The circuit court identified two reasons for concluding that this surplus proceeds term of sale was unenforceable, both of which Simard advances in his brief. First, the court ruled that "no valid consideration existed for Simard's forfeiture of the right to surplus to which the defaulting purchaser would otherwise be entitled." Second, the court concluded that enforcing such a term would be against public policy. Below, we address these concerns individually.

 Applying the contract principles outlined above, we disagree with the circuit court that any independent consideration was required to support Simard's waiver of his right to any surplus proceeds. Because Simard, by bidding at the

initial sale, offered to be bound by the terms of sale in the advertisement and to pay a purchase price in the amount of his bid, and the court agreed to sell the property to him in consideration for his promise to comply with those terms of sale and to pay the purchase money, the contract of sale was supported by valid consideration. *See Restatement* § 71 ("To constitute consideration, a performance or a return promise must be bargained for"—something is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise"). The waiver of the right to any surplus proceeds was a term of the contract.

By ruling that the "language contained in the advertisement [of sale] cannot operate to alter the princip[les] of law governing entitlement to surplus and that to so allow would be a contract of adhesion and can have a chilling effect on securing foreclosure bids," the court seemed to draw on two concepts. The first governs judicial sales in particular. *See, e.g., Stewart,* 81 Md. at 526–27, 32 A. 285 (trustees must act equitably towards contract purchasers, and not take undue advantage of them). The second is a broader, but sparingly used doctrine that justifies striking down contracts that are contrary to public policy, particularly contracts of adhesion. *See, e.g., First Nat'l Bank of St. Mary's v. Fidelity & Dep. Co.,* 283 Md. 228, 243, 389 A.2d 359 (1978)(" '[t]he theory of public policy embodies a doctrine of vague and variable quality,' " and, unless " 'deducible in the given circumstances from constitutional or statutory provisions, ... should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection' ")(quoting *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930)). As we explain below, we see neither inequity nor undue disadvantage to Simard resulting from the waiver of surplus clause. Nor do we see violation of any public policy that would justify invalidating the waiver of surplus clause.

### Contracts Of Adhesion And Public Policy

"A contract of adhesion has been defined as one 'that is drafted unilaterally by the dominant party and then pre-

sented on a "take it or leave it" basis to the weaker party who has no real opportunity to bargain about its terms.'" *See Meyer v. State Farm Fire & Cas. Co.*, 85 Md.App. 83, 89, 582 A.2d 275 (1990)(quoting *Restatement (Second) of Conflict of Laws* § 187 cmt. b (1989)); *see, e.g., Seigneur v. Nat'l Fitness Inst., Inc.*, 132 Md.App. 271, 283, 752 A.2d 631 (2000)(fitness club contract, containing exculpatory clause, was enforceable contract of adhesion). We find it unnecessary to decide whether the contract made between Simard and the Trustees was a contract of adhesion because

> [t]he fact that a contract is one of adhesion does not mean that either it or any of its terms are invalid or unenforceable. A court will, to be sure, look at the contract and its terms with some special care. As in most cases, it will refuse to enforce terms that it finds unconscionable and will construe ambiguities against the draftsman; **but it will not simply excise or ignore terms merely because, in the given case, they may operate to the perceived detriment of the weaker party.**

*Meyer*, 85 Md.App. at 89–90, 582 A.2d 275 (emphasis added). Even looking at this unambiguous contract with "some special care," we are not persuaded that the waiver of surplus clause is against public policy. *See id.*

Maryland courts "will not invalidate a private contract on grounds of public policy unless the clause at issue is patently offensive." *Wolf v. Ford*, 335 Md. 525, 537, 644 A.2d 522 (1994). The Court of Appeals "ha[s] been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would . . . pronounce it invalid.'" *Anne Arundel County v. Hartford Accident & Indem. Co.*, 329 Md. 677, 686–87, 621 A.2d 427 (1993) (citations and some quotation marks omitted). In this regard, courts usually look to the legislative branch for determination of public policy. *See Dwayne Clay, M.D., P.C. v. Gov't Employees Ins. Co.*, 356 Md. 257, 264, 739 A.2d 5 (1999)("[D]eclaration

of public policy is normally the function of the legislative branch") (citations and quotations marks omitted).

## Simard's Position As Contracting Party

In examining Simard's agreement to the waiver of surplus clause, we begin by observing that, at a foreclosure sale, it is not the bidder who is the party suffering from adverse circumstances. The mortgagor, whose property is sold, is the one who risks having his property sold at a "distress price." *See, e.g., Vardanega v. I.R.S.,* 170 F.3d 1184, 1186–87 (9th Cir.), *cert. denied,* 528 U.S. 872, 120 S.Ct. 174, 145 L.Ed.2d 147 (1999)(recognizing that property sold at mortgage foreclosures may be at "distress prices"); *Southwest Prod. Co. v. I.R.S.,* 882 F.2d 113, 117–18 (4th Cir.1989)(discussing same). While mortgagors typically have no choice about the foreclosure sale, bidders attend voluntarily. Indeed, the bidders often attend foreclosure, judicial, and tax sales looking for a bargain.

The waiver of surplus clause protects both the mortgagor and the lender. Purchasers only suffer potential detriment from it **if they default** on their contracts to purchase. Thus, bidders who bid with the good faith intention of fulfilling their bidding contracts stand to lose nothing from a waiver of surplus clause. We see the clause as providing reasonable and legitimate protection against purchasers who bid either with the intent of proceeding to settlement only if they can "flip" the property first, or who bid without reasonable expectation that they have the financial means to settle. Even when we examine Simard's waiver of surplus agreement "with special care," as is required for contracts of adhesion, we cannot agree that this clause is " 'patently offensive to the common good.' " *Anne Arundel County,* 329 Md. at 686–87, 621 A.2d 427 (citation omitted). Nor would "the common sense of the entire community . . . pronounce it 'invalid.' " *Id.* (citation and some quotation marks omitted).

## Trustee's Duty In Foreclosure Sales

Nor is the waiver of surplus clause violative of any duty owed by the trustee in a foreclosure sale. As we indicated

previously, in addition to his duty to treat purchasers equitably, the trustee at a foreclosure sale has a duty to ensure that the sale is made under circumstances "fairly calculated to bring the best obtainable price." *Waters*, 165 Md. at 75, 166 A. 431. In other words, he must not do anything that would have a chilling effect on the bidding. *See Preske v. Carroll*, 178 Md. 543, 552, 16 A.2d 291 (1940)("[A]ny act of an auctioneer or the party selling, or of third parties as purchasers, which prevents a fair, free and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale"); *see also* Robert Kratovil & Raymond J. Werner, *Modern Mortgage Law & Practice* § 41.08(f) at 605 (2d ed.1981)("[w]here a published notice of sale under a power of sale substantially overstates the amount of the mortgage debt, obviously this has a tendency to chill the bidding"); *Hoffman v. McCracken*, 168 Mo. 337, 67 S.W. 878, 880 (1902)(incorrect statement by trustee in notice of sale that mortgaged premises were being sold subject to senior lien chilled bidding).

We do not see how the waiver of surplus term would have a chilling effect on securing foreclosure bids, because it only operates if the purchaser defaults after the sale is ratified. Even those who bid with the expectation of quickly "flipping" the property to another purchaser can do so either by finding that purchaser before ratification, before the time for settlement, or by going to settlement and selling to the third party thereafter. As we see it, the only bidders that such a term would discourage are those who expect to default or want the option to default. Because the exclusive purpose of a foreclosure sale is to timely and efficiently recoup the balance remaining on the mortgage account, we cannot see how discouraging bidders who never intend to complete settlement on their bids could be against public policy.[6]

---

6. Significantly, in this case there has been no contention that the sale yielded an inadequate price. *See* Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 7.21 at 527 (3d ed. 1994)("The chilled bidding concept normally requires that the mortgagor actually establish

*Mealey v. Page*, 41 Md. 172 (1874), is supportive of our view. There, the Court of Appeals addressed an executor's contention, made after ratification, that the defaulting purchaser never intended to settle on the property, but rather purchased the property intending to collect any surplus proceeds gained on the property's resale. The Court explained:

> Trustees and executors can easily, and should, protect themselves, and the estates they represent, from such imposition and practices as the [executor] alleges here, by observing with strictness the powers under which they act. They can, and should, in all cases where there are doubts of the good faith, or solvency of the purchaser, require security for the compliance with the terms of sale, and that before the sale is ratified. By observing this precaution all danger of imposition, such as here complained of, is at once effectually avoided.

*Id.* at 185. The preventative action that the Trustees took here—namely, advertising this waiver of surplus term as an express term of the contract of sale—is consistent with the *Mealey* Court's encouragement of trustees to "protect themselves" from prospective purchasers who bid on property at a public sale never intending to proceed to settlement.

### Conclusion

Because we hold that the surplus proceeds of resale must be credited against the deficiency on the mortgage account, in light of the term of sale agreed to by Simard, we reverse the judgment of the circuit court. We have not addressed Simard's contention that he was entitled to some or all of the surplus proceeds because of improvements he made to the property in the interim between the initial sale and the resale. The circuit court did not reach this issue, and it may require factual findings that the circuit court must make. Accordingly, we remand the case to the circuit court for determination of that issue.

---

that the bidding was suppressed; this is often done by showing inadequacy of the sale price'').

## II.

### Attorney's Fees

Simard asserts that the court erred in "arbitrarily" awarding attorney's fees to appellants. He argues that "the Court entered an award that rewarded [the Lender and Trustees] for forcing the litigation based solely on the fact that this was a foreclosure case and that all the cost and expenses of the foreclosure are to be paid as part of the expenses of sale." He notes that the Lender and Trustees did not request attorney's fees until **after** the court remanded the case to the auditor to re-state the account to reflect Simard's entitlement to the surplus.

We do not decide the propriety of the award of attorney's fees because we agree with the Lender and Trustees that Simard failed to preserve this issue for appellate review. Although Simard filed exceptions to the auditor's original report, asserting that he was entitled to the surplus proceeds of the resale, he did not file exceptions to the auditor's **re-stated** account, in which the auditor awarded the attorney's fees to the Trustees' attorneys. Therefore, the challenge Simard now asserts was never raised before the circuit court. *See* Md. Rule 2–543(g)(1)("[e]xceptions ... shall set forth the asserted error with particularity. Any matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise"). Simard has failed to preserve the issue for our review, and we will not exercise our discretion to address it. *See* Md. Rule 8–131(a).

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE/CROSS–APPELLANT.**